UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

------------------------------------------------------------

UNITED STATES OF AMERICA

v.

RUBIN/CHAMBERS, DUNHILL INSURANCE
SERVICES, INC. dba CHAMBERS, DUNHILL,
RUBIN & CO. and CDR FINANCIAL
PRODUCTS, INC.;
DAVID RUBIN;
ZEVI WOLMARK, aka STEWART WOLMARK;
and EVAN ANDREW ZAREFSKY,

Defendants.

------------------------------------------------------------x

09 Cr.

**09 CRIM 1058**

Filed:

Violations:

15 U.S.C. § 1
18 U.S.C. § 371
18 U.S.C. § 1343
18 U.S.C. § 1001
18 U.S.C. § 1005
26 U.S.C. § 7212

INDICTMENT

The Grand Jury charges:

COUNT ONE – CONSPIRACY TO RESTRAIN TRADE
(15 U.S.C. § 1)

1.    RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC.,

DAVID RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and EVAN

ANDREW ZAREFSKY are hereby indicted and made defendants on the charge stated

below.

## I. THE RELEVANT PARTIES AND ENTITIES

During the period covered by this Count:

2.     RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC. ("CDR") was a corporation existing under the laws of the State of California with its principal place of business in Beverly Hills, CA.  CDR was a wholly-owned subsidiary of CDR Holdings, Inc.  CDR did business as Chambers, Dunhill, & Rubin Co. and as CDR Financial Products, Inc.  CDR marketed financial products and services, including services as a broker or advisor to various municipalities throughout the United States.

3.     DAVID RUBIN, a resident of Los Angeles, CA, was the founder, president and chief executive officer of CDR and the sole owner of CDR Holdings, Inc.

4.     ZEVI WOLMARK, aka STEWART WOLMARK, a resident of Los Angeles, CA, was the chief financial officer and a managing director of CDR.

5.     EVAN ANDREW ZAREFSKY, a resident of Redondo Beach, CA, was a vice president of CDR.

6.     Whenever in this Count reference is made to any act, deed, or transaction of any corporation, such allegation shall be deemed to mean that the corporation engaged in such act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business affairs.

7.     Various other persons and entities, not made defendants herein, participated

2

as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

## II. BACKGROUND

8.      Municipal bonds are issued by government entities, such as states, counties, and cities, or quasi-governmental entities, such as public authorities and school, utility or water districts, to raise money for operating funds or for specific projects, such as the construction of public facilities, and to refinance outstanding municipal debt.  In some instances, the entity issuing the bond turns the money over to a not-for-profit entity, such as a school or hospital, or an entity that will spend the money for a specific public purpose, such as the construction of low-cost housing or waste treatment facilities.  Both the entities that issue municipal bonds and the entities that receive and spend the money are, unless otherwise stated, collectively referred to herein as "issuers," "municipal issuers," or "municipalities."  In 2007 and 2008, combined, approximately $800 billion in municipal bonds were issued in the United States.

9.      The money an issuer raises from a municipal bond offering ("bond proceeds") is typically spent over a period of time rather than immediately, in one lump sum.  The issuer frequently invests some or all of the bond proceeds in an investment product (sometimes referred to as an "investment agreement") that is designed for its specific needs.  Investment agreements vary in size from a few hundred thousand dollars to several hundred million dollars and in duration from as short as one month to as long

3

as thirty years.

10.    Major financial institutions, including banks, investment banks, insurance companies, and financial services companies (collectively "providers") sell investment agreements through their employees or agents ("marketers").

11.    Issuers usually select providers of investment agreements through <u>bona fide</u> competitive bidding procedures that are designed to comply with federal tax laws and United States Department of the Treasury regulations relating to the tax-exempt status of municipal bonds.  Compliance with these regulations is monitored by the Internal Revenue Service ("IRS"), which is entitled to receive a portion of the earnings from a municipality's investment agreement under certain circumstances.  Among other things, each provider submitting a bid typically certifies that specific Treasury regulations have been followed, including that the provider did not consult with any other potential provider about its bid and that all providers had an equal opportunity to bid, commonly referred to as the no "last looks" provision.

12.    Issuers often hire third parties ("brokers") to act as their agents in conducting a <u>bona fide</u> competitive bidding process and complying with the relevant Treasury regulations.  CDR was such a broker.  Brokers owe a fiduciary duty to issuers that hire them and are required to act for the benefit of the issuer when conducting the competitive bidding process.  The broker's fee for conducting a <u>bona fide</u> competitive bidding process is generally paid by the winning provider, which takes into account the

4

cost of the broker's fee when calculating its bid and discloses that fee to the issuer.

13.     Brokers offer a variety of services, including offering suggestions about the availability and suitability of investment products, drafting bid specifications, and identifying the most competitive, qualified providers to be solicited as bidders.  In some cases, the broker decides which providers will be solicited to bid without consulting with the issuer or any of the other professional representatives advising the issuer.

14.     Brokers are usually responsible for distributing the bid packages (specifications and bid forms) to providers selected to receive them, usually via e-mail; keeping in touch with the potential bidders to answer questions about the bid specifications; conducting the bidding process, which typically involves receiving the providers' bids by telephone at a time identified in the bid specifications, followed by a confirming copy of the bid via facsimile.  After reviewing the bids to ensure conformity with the specifications, brokers then inform the issuer of the outcome of the bid, including the identity of the winning, qualified bidder and, if appropriate, any conditions that deviate from the specifications.  Brokers are often required by the issuer to provide written certification that the bidding procedures complied with the relevant Treasury regulations.

15.     Depending on the structure of the bid, providers may be asked to quote only the interest rate to be paid on funds on deposit for the duration of the agreement or they may be asked to submit a bid in the form of a dollar amount or date (sometimes referred to as the "price" or "price level" of a bid).  In a typical investment agreement, providers are

asked to quote only an interest rate and, generally, the agreement is awarded to the provider quoting the highest rate.

16.     Many brokers that conduct <u>bona fide</u> competitive bidding for investment agreements subject to the Treasury regulations are also hired by municipalities and other quasi-governmental entities to conduct <u>bona fide</u> competitive bidding in connection with the award of other contracts involving public funds, even though those contracts are not subject to the Treasury regulations.  These contracts (collectively, "other municipal finance contracts") include, but are not limited to, investment agreements for taxable municipal bonds; investment agreements for funds borrowed by entities in which the federal government or any municipal entity is a participant; and derivative contracts, which are contracts between a municipal issuer and a financial institution that are designed to manage or transfer some or all of the interest rate risk associated with a municipal bond issue.  Other municipal contracts do not include underwriting contracts.  CDR acted as a broker in the award of other municipal finance contracts.

### III. DESCRIPTION OF THE OFFENSE

17.     From at least as early as 1998 until at least November 2006, the exact dates being unknown to the Grand Jury, defendants CDR, RUBIN, WOLMARK and ZAREFSKY (collectively, the "CDR defendants") and co-conspirators engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

18.     The aforesaid combination and conspiracy consisted of an agreement,

understanding, and concert of action among the CDR defendants and co-conspirators, the substantial terms of which were to allocate and rig bids for investment agreements or other municipal finance contracts.

## IV.  THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

19.    For the purpose of forming and effectuating the aforesaid combination and conspiracy, the CDR defendants and co-conspirators did those things which they combined and conspired to do, including, among other things:

(a)    designating in advance of the submission of bids to CDR which provider among the co-conspirator providers would be the winning bidder for certain investment agreements or other municipal finance contracts;

(b)    discussing and agreeing on the prices or price levels co-conspirator providers would bid for certain investment agreements or other municipal finance contracts;

(c)    submitting or causing to be submitted to CDR intentionally losing bids for certain investment agreements or other municipal finance contracts with the understanding that co-conspirator providers submitting the intentionally losing bids would be allocated other investment agreements or other municipal finance contracts.  The intentionally losing bids made it appear both to the municipalities that had hired CDR as their broker and, where appropriate, to the IRS that the CDR defendants had solicited potential providers that would and did compete for those agreements and contracts, when,

7

in fact, they had not;

(d)     falsely certifying and forwarding false certifications that the bidding for certain investment agreements or other municipal finance contracts was in compliance with the relevant Treasury regulations or was otherwise competitive;

(e)     agreeing to pay and paying CDR kickbacks in the form of fees that were inflated, relative to the services performed, or unearned.  These payments were in exchange for the CDR defendants' assistance in controlling the bidding process and for ensuring that certain co-conspirator providers won the bids they were allocated.  Unlike the fees CDR was paid as a broker for conducting the bidding process, these fees were not disclosed to the municipalities that had hired CDR or to the IRS; and

(f)     paying municipalities or causing municipalities to be paid artificially determined or suppressed yields for the duration of certain investment agreements or other municipal finance contracts, thereby increasing the profitability of those agreements or contracts for the winning co-conspirator provider for their duration.

20.     For example, on numerous occasions, a co-conspirator provider recommended to a municipality that it hire CDR as broker, typically where the provider was the senior underwriter on an upcoming bond issue.  In exchange, the CDR defendants attempted to ensure and did ensure that the same provider won one or more of the investment agreements associated with that same bond issue by recommending terms for the investment agreement(s) that favored that provider, selecting other providers to bid that

8

would and did submit intentionally losing bids, and, after receiving information from the intended winning provider regarding the price or price levels it intended to bid, telling the other providers what prices or price levels to bid. As a result, the intended winning provider increased its profits from the investment agreement(s) by paying interest to the municipality for the duration of the investment agreement(s) at a rate that was artificially low.

## V. INTERSTATE TRADE AND COMMERCE

21.     From at least as early as 1998 until at least November 2006, pursuant to the investment agreements and other municipal finance contracts that are the subject of this Count, the CDR defendants and co-conspirators caused substantial amounts of money to be transferred between co-conspirator providers and municipal issuers and other government or quasi-governmental entities throughout the United States.

22.     The activities of the CDR defendants and co-conspirators with respect to the aforementioned investment agreements and other municipal finance contracts were within the flow of, and substantially affected, interstate trade and commerce.

## VI. JURISDICTION AND VENUE

23.     The aforesaid combination and conspiracy was formed and carried out, in part, within the Southern District of New York within the five years preceding the filing of this Indictment.

IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1

## COUNT TWO – CONSPIRACY
### (18 U.S.C. § 371)

### VII.  THE RELEVANT PARTIES AND ENTITIES

The Grand Jury further charges:

24.     RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC., DAVID RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and EVAN ANDREW ZAREFSKY are hereby indicted and made defendants on the charge stated below.

25.     Paragraphs 2 through 6 and 8 through 16 of Count One of this Indictment are repeated, realleged, and incorporated in Count Two as if fully set forth in this Count.

26.     Provider A was a group of related financial services companies located in Manhattan and owned or controlled by a company headquartered in Manhattan, and Marketer A, was a representative of Provider A.

27.     Financial Institution A was a financial institution that was a branch or agency of a foreign bank, within the meaning of Title18, United States Code, Section 20.

28.     Financial Institution B was a financial institution that was a branch or agency of a foreign bank, within the meaning of Title 18, United States Code, Section 20.

### VIII.  DESCRIPTION OF THE OFFENSE

29.     Various other persons and entities, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts in furtherance thereof. They included Provider A.

30.     From at least as early as August 2001 until at least November 2006, the exact

10

dates being unknown to the Grand Jury, in the Southern District of New York and

elsewhere, defendants CDR, RUBIN, WOLMARK and ZAREFSKY (collectively, the

"CDR defendants") and co-conspirators unlawfully, willfully, and knowingly did combine,

conspire, confederate, and agree together and with each other to commit offenses against

the United States, to wit, to violate Title 18, United States Code, Sections 1343 and 1005,

and to defraud the United States and an agency thereof, to wit, the Internal Revenue Service

("IRS") of the United States Department of the Treasury, all in violation of Title 18, United

States Code, Section 371.

      31.    It was a part and an object of the conspiracy that defendants CDR, RUBIN,

WOLMARK, and ZAREFSKY and co-conspirators, having devised and intending to

devise a scheme and artifice to defraud municipalities and to obtain money and property

from municipalities by means of false and fraudulent pretenses, representations, and

promises, unlawfully, willfully, and knowingly, for the purpose of executing such scheme

and artifice, and attempting to do so, would and did transmit and cause to be transmitted by

means of wire, radio or television communication in interstate or foreign commerce any

writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code,

Section 1343.

      32.    It was further a part and an object of the conspiracy that defendants CDR,

RUBIN, WOLMARK and ZAREFSKY and co-conspirators would and did defraud the

United States and the IRS by impeding, impairing, obstructing, and defeating the lawful

government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue due and owing from municipal issuers and in exercising its responsibilities to monitor compliance with Treasury regulations related to tax-exempt municipal bonds, in violation of Title 18, United States Code, Section 371.

33.     It was further a part and an object of the conspiracy that defendants CDR, RUBIN, WOLMARK, and ZAREFSKY and co-conspirators, with intent to defraud the United States or any agency thereof, to wit, the United States Department of the Treasury and the IRS, pursuant to the scheme identified in this Count, participated, shared in and received (directly and indirectly) money, profit, property, and benefits, to wit, one or more kickbacks identified in this Count, through transactions, commissions, contracts and any other acts of a financial institution, to wit, Financial Institution A and B, in violation of Title 18, United States Code, Section 1005.

## IX.  THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

34.     The CDR defendants and co-conspirators engaged in an ongoing scheme to defraud municipalities and the IRS by causing municipal issuers to enter into investment agreements and other municipal finance contracts with Provider A at artificially determined or suppressed price levels through the control and manipulation of the bidding for those agreements and contracts.  In exchange, certain of the CDR defendants asked that Provider

A pay kickbacks to CDR.  Provider A agreed and arranged to pay kickbacks to CDR in the following manner: the kickbacks were disguised as fees ("hedge fees") that purported to compensate CDR for acting as a broker in arranging financial transactions known as swaps between Provider A and either Financial Institution A or B, but those fees were, in fact, unearned or inflated.  The rates of Provider A's swaps with Financial Institutions A and B were adjusted to include the hedge fees Provider A wanted to pay CDR, and Financial Institutions A and B then paid the hedge fees to CDR.  Neither CDR nor Provider A disclosed to issuers that Provider A had agreed to pay CDR hedge fees in connection with the award and execution of investment agreements or other municipal finance contracts.  In some cases, these kickbacks reduced the amount of money the municipalities received and continue to receive pursuant to investment agreements or other municipal finance contracts awarded to Provider A.

     35.    The CDR defendants attempted to increase the number and profitability of investment agreements and other municipal finance contracts awarded to Provider A by controlling which other providers were solicited for bids and securing the agreement of other providers to submit intentionally losing bids, where possible, and by arranging for Marketer A to submit Provider A's bid last.  Before Marketer A actually decided what price to bid, the CDR defendants and co-conspirators at CDR received and reviewed bids from other providers and gave Marketer A information about the prices, price levels or conditions of those bids, including, on occasion, the specific amounts other providers had bid.

Marketer A then used that information to determine Provider A's bid. On some occasions, the CDR defendants told Marketer A that he could lower Provider A's bid and still win the contracts and, further, suggested the exact amount by or to which the bid could be reduced. Marketer A followed these suggestions. As a result of information the CDR defendants gave Marketer A about bids from other providers, Provider A was awarded and has performed and is scheduled to continue to perform investment agreements and other municipal finance contracts at artificially determined levels that deprived and will continue to deprive municipalities of money.

36.     From time to time, certain of the CDR defendants asked Marketer A to submit intentionally losing bids for investment agreements or other municipal finance contracts, in order to create the appearance that Provider A was competing for agreements or contracts when, in fact, it was not.

37.     The CDR defendants falsely certified or caused to be certified that the bidding process was bona fide and complied with relevant Treasury regulations or was otherwise competitive and received and forwarded bids and certifications from Marketer A or Provider A and other co-conspirator providers containing corresponding false representations.

38.     By secretly controlling and manipulating the bidding for investment agreements and other municipal finance contracts, the CDR defendants caused municipalities not to file required reports or to file inaccurate reports with the IRS, and to fail to give the IRS or the Treasury money to which it was entitled, thus jeopardizing the

tax-exempt status of the underlying bonds.

## X. OVERT ACTS

39.     In furtherance of the conspiracy and to effect the illegal objects thereof, the

CDR defendants and co-conspirators committed the following overt acts, among others, in

the Southern District of New York and elsewhere:

(a)     On numerous occasions, at or about the time the bid specifications

stated that bids were due, the CDR defendants participated in interstate telephone calls

between California and New York, New York during which they gave Marketer A

information about the prices, price levels, or conditions of bids from other providers and

Marketer A then used that information to determine Provider A's bid.

(b)     On numerous occasions, at or about the time the bid specifications

stated that bids were due, the CDR defendants participated in interstate telephone calls

between California and New York, New York during which they asked Marketer A to

submit intentionally losing bids for investment agreements and other municipal finance

contracts and provided him with pricing information to assist him in doing so.

(c)     On numerous occasions, prior to taking bids for certain investment

agreements or other municipal finance contracts, certain of the CDR defendants participated

in interstate telephone calls between California and New York, New York with Marketer A

and other co-conspirators during which they made or sought to make arrangements for CDR

to receive kickbacks in the form of purported hedge fees that were not disclosed to the

municipality.  On at least ten occasions between approximately November 2001 and August 2005, CDR received kickbacks ranging in size from $4,500 to $475,000.

(d)     On numerous occasions, the CDR defendants falsely certified or caused to be certified that the bidding process complied with relevant Treasury regulations, or was otherwise competitive, and forwarded bids and certifications from Marketer A or Provider A and other co-conspirator providers containing corresponding false representations.

(e)     On numerous occasions, Provider A paid via wire transfer and is scheduled to continue to pay municipalities interest on money it received pursuant to investment agreements or other municipal finance contracts whose rates were artificially determined or suppressed.

(f)     With respect to the award and performance of three investment agreements for a state water development authority, the CDR defendants and co-conspirators committed the following overt acts, among others:

(i)     on or about October 23, 2003, during an interstate telephone conversation between California and New York, New York about 90 minutes before the bids were due, defendant WOLMARK spoke to Marketer A about the arrangements for Provider A to pay CDR kickbacks in the form of hedge fees and to enter into one or more swaps with either Financial Institution A or B relating to the investment agreements for the state authority.

(ii)    on or about October 23, 2003, during an interstate telephone

conversation between California and New York, New York about 30 minutes after the bids were due, defendant ZAREFSKY gave Marketer A information about the bid prices submitted by other providers and suggested that Marketer A change the prices he was otherwise prepared to submit, including lowering the interest rate on one of the agreements to a specific number. Marketer A agreed to and did submit prices at the amounts or levels suggested by ZAREFSKY.

(iii)    on or about October 23, 2003, after Provider A had been awarded the state authority's three investment agreements, Marketer A made arrangements to pay CDR a kickback in the form of a hedge fee in connection with a swap between Provider A and Financial Institution B relating to one of the investment agreements with the state authority.

(iv)    on or about October 27, 2003, CDR sent an invoice to Financial Institution B for a $4,500 hedge fee in connection with the swap between Financial Institution B and Provider A relating to one of the investment agreements with the state authority.

(v)    on or about October 31, 2003, CDR executed a broker's certificate that, among other things, falsely stated: "All bidders had an equal opportunity to bid. No 'last look' by any bidder was permitted."

(vi)    on or about October 31, 2003, Provider A entered into three investment agreements with the state authority, two at the rates determined through the

bidding conducted by CDR and the other adjusted to account for a change in the specifications.

(vii)   on or about November 3, 2003, CDR received via wire transfer a kickback relating to one of the investment agreements with the state authority in the form of a $4,500 hedge fee from Financial Institution B in connection with the swap between Provider A and Financial Institution B.

(viii)   on or about November 10, 2003, CDR sent an invoice to Financial Institution B for a second $4,500 hedge fee in connection with the swap between Financial Institution B and Provider A relating to one of the investment agreements with the state authority.

(ix)   beginning approximately in late November 2003 and continuing until January 3, 2005, Provider A made monthly interest payments on one of the state authority's funds at a rate that was artificially suppressed.

(x)   on or about August 12, 2005, CDR received via wire transfer a kickback relating to one of the investment agreements with the state authority in the form of a $4,500 hedge fee in connection with the swap between Provider A and Financial Institution B.

(g)   With respect to the award and performance of an investment agreement with a municipal port facility, the CDR defendants and co-conspirators committed the following overt acts, among others:

18

(i)    on or about September 26, 2002, during an interstate telephone conversation between California and New York, New York about an hour before the bids were due, defendant WOLMARK spoke to Marketer A about the arrangements for Provider A to pay CDR kickbacks in the form of hedge fees and to enter into one or more swaps with Financial Institution A.

(ii)    on or about September 26, 2002, during an interstate telephone conversation between California and New York, New York at about the time that bids were due, defendant WOLMARK gave Marketer A information about the bids submitted by three providers and they agreed on the rate Provider A would bid and the amount of the kickback CDR would receive in the form of a hedge fee.

(iii)    on or about September 26, 2002, after Provider A had been awarded the municipal port facility's investment agreement, Marketer A made arrangements to pay CDR a kickback in the form of a hedge fee in connection with a swap between Provider A and Financial Institution A relating to that agreement.

(iv)    on or about September 30, 2002, CDR received via wire transfer a kickback in the form of a $25,000 hedge fee in connection with the swap between Provider A and Financial Institution A relating to the investment agreement with the municipal port facility.

(v)    on or about October 15, 2002, CDR executed a broker's certificate that, among other things, falsely stated: "All providers were afforded an equal

19

opportunity to bid (e.g., no provider was given a 'last look')."

(vi)     on or about October 15, 2002, Provider A entered into an investment agreement with the municipal port facility at the rate determined through the bidding conducted by CDR.

(vii)     beginning approximately in May 2003, Provider A made semi-annual interest payments to the municipal port facility at a rate that was artificially determined, which payments continued until at least October 2006.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371

## COUNT THREE – CONSPIRACY
### (18 U.S.C. § 371)

## XI. THE RELEVANT PARTIES AND ENTITIES

The Grand Jury further charges:

40.     RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC., DAVID

RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and EVAN ANDREW

ZAREFSKY are hereby indicted and made defendants on the charge stated below.

41.     Paragraphs 2 through 6 and 8 through 16 of Count One of this Indictment are

repeated, realleged, and incorporated in Count Three as if fully set forth in this Count.

42.     Various other persons and entities, not made defendants herein, participated as

co-conspirators in the offense charged herein and performed acts in furtherance thereof.

They included Provider B, which was a group of separate financial services entities that

were controlled by or were part of a company headquartered in Connecticut, and Marketers

B-1 and B-2, who were representatives of Provider B from 1999 until 2001 and from 2000

until at least 2006, respectively.  Both marketers worked at Provider B's offices in

Manhattan.

## XII. DESCRIPTION OF THE OFFENSE

43.     From at least as early as August 1999 until at least November 2006, the exact

dates being unknown to the Grand Jury, in the Southern District of New York and

elsewhere, defendants CDR, RUBIN, WOLMARK and ZAREFSKY (collectively, the

"CDR defendants") and co-conspirators unlawfully, willfully, and knowingly did combine,

21

conspire, confederate, and agree together and with each other to commit offenses against the

United States, to wit, to violate Title 18, United States Code, Section 1343, and to defraud

the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the

United States Department of the Treasury, all in violation of Title 18, United States Code,

Section 371.

44.    It was a part and an object of the conspiracy that defendants CDR, RUBIN,

WOLMARK, and ZAREFSKY and co-conspirators, having devised and intending to devise

a scheme and artifice to defraud municipalities and to obtain money and property from

municipalities by means of false and fraudulent pretenses, representations, and promises,

unlawfully, willfully, and knowingly, for the purpose of executing such scheme and artifice,

and attempting to do so, would and did transmit and cause to be transmitted by means of

wire, radio or television communication in interstate or foreign commerce any writings,

signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343.

45.    It was further a part and object of the conspiracy that defendants CDR,

RUBIN, WOLMARK and ZAREFSKY and co-conspirators would and did defraud the

United States and the IRS by impeding, impairing, obstructing, and defeating the lawful

government functions of the IRS in the ascertainment, computation, assessment, and

collection of revenue due and owing from municipal issuers and in exercising its

responsibilities to monitor compliance with Treasury regulations related to tax-exempt

municipal bonds, in violation of Title 18, United States Code, Section 371.

## XIII.  THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

46.     The CDR defendants and co-conspirators engaged in an ongoing scheme to defraud municipalities and the IRS by causing municipal issuers to enter into investment agreements and other municipal finance contracts with Provider B at artificially determined or suppressed price levels through the control and manipulation of the bidding for those agreements and contracts.

47.     The CDR defendants attempted to increase the number and profitability of investment agreements and other municipal finance contracts awarded to Provider B by arranging for Marketer B-1 or B-2 to submit Provider B's bids last.  Before Marketer B-1 or B-2 actually decided what prices to bid, the CDR defendants received and reviewed bids from other providers and gave Marketer B-1 or B-2 information about the prices, price levels or conditions of those bids, including, on occasion, the specific amounts other providers had bid.  Marketer B-1 or B-2 then used that information to determine Provider B's bids.  On some occasions, the CDR defendants told Marketer B-1 or B-2 that he could lower Provider B's bid and still win the contract and, further, suggested the specific amount by or to which the bid could be reduced.  Marketers B-1 and B-2 followed these suggestions. As a result of information the CDR defendants gave Marketers B-1 and B-2 about bids from other providers, Provider B was awarded and has performed and is scheduled to continue to

23

perform investment agreements and other municipal finance contracts at artificially determined levels that deprived and will continue to deprive municipalities of money.

48.    In exchange for controlling and manipulating the bidding for investment agreements and other municipal finance contracts in order to increase the number and profitability of the agreements and contracts Provider B won, certain of the CDR defendants asked Marketer B-1 or B-2 to submit intentionally losing bids for investment agreements or other municipal finance contracts, in order to create the appearance that Provider B was competing for agreements or contracts when, in fact, it was not.

49.    The CDR defendants falsely certified or caused to be certified that the bidding process complied with relevant Treasury regulations, or was otherwise competitive, and forwarded bids and certifications from Marketer B-1 or B-2 or Provider B and other co-conspirator providers containing corresponding false representations.

50.    By secretly manipulating and controlling the bidding for investment agreements and other municipal finance contracts, the CDR defendants caused municipalities not to file required reports with the IRS or to file inaccurate reports with the IRS, and to fail to give the IRS or the Treasury money to which it was entitled, thus jeopardizing the tax-exempt status of the underlying bonds

51.    In exchange for controlling and manipulating the bidding for investment agreements and other municipal finance contracts in order to increase the number and profitability of the agreements and contracts Provider B won, certain of the CDR defendants

also requested that Provider B pay kickbacks, and Provider B did in fact pay kickbacks, to CDR. The kickbacks were to be disguised as fees ("hedge fees") that purported to compensate CDR for acting as a broker in arranging financial transactions known as swaps between Provider B and other financial institutions, but those fees were in fact unearned or inflated.

## XIV. OVERT ACTS

52.      In furtherance of the conspiracy and to effect the illegal objects thereof, the CDR defendants and co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

(a)      On numerous occasions, at or about the time the bid specifications stated that bids were due, the CDR defendants participated in interstate telephone calls between California and New York, New York during which they gave Marketer B-1 or B-2 information about the prices, price levels, or conditions of bids from other providers and Marketer B-1 or B-2 used that information to determine Provider B's bids.

(b)      On numerous occasions, at or about the time the bid specifications stated that bids were due, the CDR defendants participated in interstate telephone calls or other wire transmissions between California and New York, New York during which they asked Marketer B-1 or B-2 to submit intentionally losing bids for investment agreements and other municipal finance contracts and provided them with pricing information to assist them in doing so.

(c)    On numerous occasions, prior to taking bids for certain investment agreements or other municipal finance contracts, certain of the CDR defendants participated in interstate telephone calls between California and New York, New York with Marketer B-1 or B-2 during which they made or sought to make arrangements for CDR to receive kickbacks in the form of purported hedge fees that were not disclosed to the municipality.

(d)    On numerous occasions, the CDR defendants falsely certified or caused to be certified that the bidding process complied with relevant Treasury regulations, or was otherwise competitive, and forwarded bids and certifications from Marketer B-1 or B-2 or Provider B containing corresponding false representations.

(e)    On numerous occasions, Provider B paid via wire transfer and is scheduled to continue to pay municipalities interest on money it received pursuant to investment agreements or other municipal finance contracts whose rates were artificially determined or suppressed.

(f)    With respect to the award and performance of an investment agreement for a state housing agency, certain of the CDR defendants and co-conspirators committed the following overt acts, among others:

(i)    on or about May 19, 2004, during an interstate telephone call between California and New York, New York, defendant RUBIN suggested to Marketer B-2 that he lower the rate he said he was preparing to quote because the issuer would have to give any money it earned at the higher rate to the IRS.

26

(ii)      on or about May 20, 2004, the day of the bid, during an interstate telephone call between New Mexico and New York, New York, Marketer B-2 checked with a co-conspirator at CDR to make sure that a bid at the rate suggested by RUBIN would be a winning bid and then submitted a bid in accordance with RUBIN's suggestion.

(iii)     beginning in approximately July 2004, Provider B made monthly interest payments to the state housing agency at an artificially suppressed rate until November 1, 2005.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371

## COUNTS FOUR AND FIVE – WIRE FRAUD
### (18 U.S.C. § 1343)

The Grand Jury further charges:

53.     RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC. ("CDR"),
DAVID RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and EVAN ANDREW
ZAREFSKY are hereby indicted and made defendants on the charges stated below.

54.     Paragraphs 2 through 6 and 8 through 16 of Count One and Paragraphs 26 and
29 of Count Two, and Paragraph 42 of Count Three of this Indictment, are repeated,
realleged, and incorporated in Counts Four and Five, respectively, as if fully set forth in these
Counts.

## XV.  DESCRIPTION OF THE OFFENSE

55.     On or about the dates indicated below, in the Southern District of New York
and elsewhere, defendants CDR, RUBIN, WOLMARK and ZAREFSKY and other persons
known and unknown, unlawfully, willfully, and knowingly, having devised and intending to
devise a scheme and artifice to defraud municipal issuers and to obtain money and property
from these municipal issuers by means of false and fraudulent pretenses, representations, and
promises, for the purpose of executing such scheme and artifice, and attempting to do so, did
transmit and cause to be transmitted by means of wire, radio, or television communication in
interstate commerce, writings, signs, signals, pictures, or sounds the following:

COUNT FOUR: On or about August 12, 2005, via interstate wire transfer from New
York, New York to Beverly Hills, California, defendant CDR received a kickback in the

28

form of a $4,500 hedge fee in connection with one of three investment agreements that defendants CDR, RUBIN, WOLMARK, and ZAREFSKY had caused a state water development authority to award to Provider A at rates that had not been determined competitively.

COUNT FIVE: On or about June 30, 2005, via interstate wire transfer from New York, New York to Salt Lake City, Utah, defendants CDR, RUBIN, WOLMARK and ZAREFSKY caused Provider B to make an interest payment of approximately $264,977.20 to a state housing corporation, which payment was artificially suppressed because, at the time of the bid, defendant ZAREFSKY gave Marketer B-2 information about bids from other providers on the basis of which Marketer B-2 lowered the rates he was otherwise prepared to submit.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1343

## COUNT SIX – WIRE FRAUD
### (18 U.S.C. § 1343)

The Grand Jury further charges:

56.     RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC. ("CDR"),
DAVID RUBIN, and ZEVI WOLMARK, aka STEWART WOLMARK are hereby indicted
and made defendants on the charges stated below.

57.     Paragraphs 2 through 4, Paragraph 6, Paragraphs 8 through 16 of Count One,
and Paragraphs 26 and 29 of Count Two are repeated, realleged, and incorporated in Count
Six as if fully set forth in this Count.

### XVI.  DESCRIPTION OF THE OFFENSE

58.     On or about the date indicated below, in the Southern District of New York and
elsewhere, defendants CDR, RUBIN, and WOLMARK and other persons known and
unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a
scheme and artifice to defraud the municipal issuer set forth below, to obtain money and
property from municipal issuers by means of false and fraudulent pretenses, representations,
and promises, for the purpose of executing such scheme and artifice, and attempting to do so,
did transmit or cause to be transmitted by means of wire, radio, or television communication
in interstate commerce, writings, signs, signals, pictures, or sounds the following:

COUNT SIX: On or about May 31, 2006, via interstate wire transfer from New
York, New York to Kansas City, Missouri, defendants CDR, RUBIN, and WOLMARK
caused Provider A to make an interest payment of approximately $442,341.39 to a state

program, which interest payment was at an artificially determined rate because, at the time that Marketer A determined Provider A's bid, he was asked to pay and agreed to pay a kickback to CDR that amounted to $475,000.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1343

## COUNT SEVEN -- FALSE STATEMENTS BY ZAREFSKY
### (18 U.S.C. § 1001)

The Grand Jury further charges:

59.    EVAN ANDREW ZAREFSKY is hereby indicted and made a defendant on the charge stated below.

60.    Paragraphs 5 and 8 through 16 of Count One of this Indictment are repeated, realleged and incorporated in Count Seven as if fully set forth in this Count.

61.    On numerous occasions between 2000 and 2004, in connection with the bidding for investment agreements subject to the Treasury regulations, defendant ZAREFSKY gave information about the prices, price levels or conditions of other providers' bids to marketers for certain providers and those marketers used that information to determine what became the winning bid.  During the same period, ZAREFSKY solicited intentionally losing bids from marketers at certain providers, including bids from marketers who told ZAREFSKY that the providers they represented were not able to enter into the investment agreements at issue.  In addition, during the same period, ZAREFSKY saw and heard other CDR employees engaging in the same conduct.

62.    On November 15, 2006, defendant ZAREFSKY unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device a material fact, and made materially false, fictitious, and fraudulent statements and representations, to wit, in connection with an investigation being conducted in the Southern

32

District of New York, ZAREFSKY was interviewed by agents of the Federal Bureau of Investigation and the IRS during a search of the premises of CDR and falsely stated that the deals he worked on were done within the regulations, that he did not give "last looks" in connection with the bidding for investment agreements subject to the regulations, and that he had no first-hand knowledge regarding "last looks" or "courtesy" bids.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1001(a)(1) and (2)

## COUNT EIGHT – INTERFERING WITH ADMINISTRATION
## OF INTERNAL REVENUE LAWS
(26 U.S.C. § 7212(a))

The Grand Jury further charges:

63.    DAVID RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and
EVAN ANDREW ZAREFSKY are hereby indicted and made defendants on the charges
stated below.

64.    Paragraphs 3 through 5 and 8 through 15 of Count One of this Indictment are
repeated, realleged, and incorporated in Count Eight as if fully set forth in this Count.

65.    From at least as early as February 1999, with respect to defendants RUBIN and
WOLMARK, and from at least as early as June 2000, with respect to defendant ZAREFSKY,
until at least November 2006, within the Southern District of New York and elsewhere,
defendants RUBIN, WOLMARK and ZAREFSKY, and other persons known and unknown,
did corruptly obstruct and impede, and endeavor to obstruct and impede, the due
administration of the Internal Revenue laws.

66.    Among the means and methods used by defendants RUBIN, WOLMARK and
ZAREFSKY to corruptly obstruct and impede and endeavor to obstruct and impede the due
administration of the Internal Revenue laws were the following:

(a)    On numerous occasions, RUBIN, WOLMARK and ZAREFSKY
conducted or authorized CDR employees to conduct bidding for investment agreements
subject to the Treasury regulations in a manner inconsistent those regulations by controlling

34

and manipulating the bidding so as to help particular providers win certain contracts, often at increased profit levels. On some occasions, RUBIN, WOLMARK and ZAREFSKY selected and solicited, or authorized or instructed other CDR employees to select and solicit, providers to bid that would and did agree to submit intentionally losing bids. On other occasions, RUBIN, WOLMARK and ZAREFKSKY gave or authorized or instructed CDR employees to give the intended winning provider information about the prices, price levels or conditions of bids from other providers, in some instances thereby causing the winning provider to change its bid and increase its profits.

(b)     RUBIN, WOLMARK and ZAREFKSY caused CDR to falsely certify that the bidding process was <u>bona fide</u> and complied with relevant Treasury regulations and caused CDR to receive and forward bids and certifications from providers containing corresponding false certifications, thereby creating the appearance that there had been open and honest competition for investment agreements, when, in fact, there had not.

(c)     By secretly controlling and manipulating the bidding for investment agreements subject to the Treasury regulations, RUBIN, WOLMARK and ZAREFSKY caused municipalities not to file required reports or to file inaccurate reports with the IRS, and to fail to give the IRS or the Treasury money to which it was entitled.

(d)     With respect to an investment agreement for a state housing agency:

(i)     on or about May 19, 2004, during an interstate telephone call between California and New York, New York, RUBIN suggested to a provider's

representative that he lower the rate he said he was preparing to quote for an investment agreement because the issuer would have to give any money it earned at the higher rate to the IRS.

(ii) on or about May 20, 2004, RUBIN caused CDR to receive a bid from the provider reflecting a rate in accordance with his suggestion and a certification that, among other things, falsely stated: "CDR Financial Products, Inc. has not provided us any information which induced us to bid a yield lower than the yield induced by the Request for Investment Agreement."

(iii) on or about June 1, 2004, RUBIN caused CDR to execute and send to the issuer's counsel a broker's certificate that, among other things, falsely stated: "The winning bid was the highest yielding bona fide bid (determined net of any bidding agent's fees) which met the requirements of the bid solicitation[.]"

(e) With respect to three investment agreements for a state water development authority:

(i) on or about October 23, 2003, pursuant to standing instructions from RUBIN and WOLMARK, ZAREFSKY gave a provider's representative information about the bid prices submitted by other providers and suggested that the provider lower the interest rate on one of the agreements being bid to a specific number, which the provider did. On the same day, RUBIN, WOLMARK and ZAREFSKY thereby caused CDR to receive a bid at an artificially suppressed rate for that investment agreement and a certification that,

36

among other things, falsely stated: "CDR Financial Products, Inc. has not provided us any information that induced us to bid a yield lower than the yield induced by the Request for Investment Agreement."

    (ii) on or about October 31, 2003, RUBIN, WOLMARK and ZAREFSKY caused CDR to execute a false broker's certificate relating to that same investment agreement, as specified in Paragraph 39(f)(v) of Count Two of this Indictment.

   IN VIOLATION OF TITLE 26, UNITED STATES CODE, SECTION 7212(a)

## COUNT NINE – FRAUDULENT BANK TRANSACTIONS
### (18 U.S.C. § 1005)

The Grand Jury further charges:

67.     DAVID RUBIN is hereby indicted and made a defendant on the charge stated below.

68.     Paragraphs 2 through 3 and 8 through 15 of Count One and Paragraphs 26 through 27, and 34 through 38, and 39(g) of Count Two of this Indictment are repeated, realleged, and incorporated in Count Nine as if fully set forth in this Count.

69.     On or about September 30, 2002, within the Southern District of New York and elsewhere, defendant RUBIN, with the intent to defraud the United States and the Department of the Treasury and the IRS of money and of true and accurate information regarding the bidding for an investment agreement with a municipal port facility, as more fully set forth above, participated, shared in, and received (directly and indirectly) money, profit, property, and benefits, through a transaction, commission, contract, and any other act of Financial Institution A, to wit, a $25,000 payment to RUBIN that was disguised as a hedge fee paid by Financial Institution A to RUBIN's company CDR, and was generated from a swap transaction between Financial Institution A and Provider A and

was related to the investment agreement that RUBIN caused the municipal port facility to award to Provider A.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1005

Dated:

A True Bill

_____
Foreperson

_____
CHRISTINE A. VARNEY
Assistant Attorney General

_____
SCOTT D. HAMMOND
Deputy Assistant Attorney General

_____
MARC SIEGEL
Director of Criminal Enforcement

Antitrust Division
U.S. Department of Justice

_____
PREET BHARARA
United States Attorney
Southern District of New York

_____
RALPH T. GIORDANO
Chief, New York Office

_____
REBECCA MEIKLEJOHN
STEVEN TUGANDER
KEVIN B. HART
MICHELLE RINDONE

Attorneys, Antitrust Division
U.S. Department of Justice

26 Federal Plaza, Room 3630
New York, New York 10278
(212) 264-0654

39

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

**RUBIN/CHAMBERS, DUNHILL INSURANCE
SERVICES INC. dba CHAMBERS, DUNHILL, RUBIN
& CO. and CDR FINANCIAL PRODUCTS, INC.;
DAVID RUBIN;
ZEVI WOLMARK, aka STEWART WOLMARK;
and EVAN ANDREW ZAREFSKY**

**Defendants.**

### INDICTMENT

09 Cr.

15 U.S.C. § 1
18 U.S.C. § 371
18 U.S.C. § 1343
18 U.S.C. § 1001
18 U.S.C. § 1005
26 U.S.C. § 7212

PREET BHARARA
United States Attorney.

**A TRUE BILL**

Foreperson.

*RC*
*10/29/09*

*Indictment filed, case assigned to
Judge Marrero - F. Maas, USMJ*