RECEIVED
DEC 3 0 2011
CHAMBERS OF
JUDGE MARRERO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

*09 Cr 1058*

UNITED STATES OF AMERICA

    v.

RUBIN/CHAMBERS, DUNHILL INSURANCE
SERVICES, INC. dba CHAMBERS, DUNHILL
RUBIN & CO. and CDR FINANCIAL
PRODUCTS, INC.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Criminal No.:

Filed:

Violations:

    15 U.S.C. § 1
    18 U.S.C. § 371
    18 U.S.C. § 1343
    18 U.S.C. § 1346

### PLEA AGREEMENT

The United States Department of Justice, Antitrust Division ("Antitrust Divison") and the

defendant, RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC. dba

CHAMBERS, DUNHILL RUBIN & CO. and CDR FINANCIALPRODUCTS, INC. ("CDR"), a

corporation organized and existing under the laws of California, hereby enter into the following

Plea Agreement ("Agreement") pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal

Procedure ("Fed. R. Crim. P.").

### CDR'S AGREEMENT TO PLEAD GUILTY

1.     CDR agrees to plead guilty to Counts One, Two and Six of the pending eight-

count Superseding Indictment, *United States v. Rubin/Chambers, Dunhill Insurance Services*

*Inc., et al.*, S1 09 Cr. 1058 (VM), in the United States District Court for the Southern District of

New York.  Count One charges CDR with violating 15 U.S.C. § 1, in connection with a

conspiracy to allocate and rig bids for investment agreements or other municipal finance

contracts, from at least as early as 1998 until at least November 2006, as described in the

attached Superseding Indictment.  Count Two charges CDR with violating 18 U.S.C. § 371, in

connection with a conspiracy to defraud municipal issuers, the United States and the Internal

Revenue Service, from at least as early as August 2001 until at least November 2006, as

described in the attached Superseding Indictment.  Count Six charges CDR with violating 18

U.S.C. §§ 1343 and 1346 in connection with effecting a wire transfer in furtherance of a scheme

to defraud municipal issuers, as described in the attached Superseding Indictment.

2.     CDR understands and agrees that should a conviction following its pleas of guilty

pursuant to this Agreement be vacated for any reason, any prosecution that is not time-barred by

the applicable statute of limitations on the date of the signing of this Agreement (including any

counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may

be commenced or reinstated against it, notwithstanding the expiration of the statute of limitations

between the signing of this Agreement and the commencement or reinstatement of such

prosecution.  It is the intent of this Agreement to waive all defenses based on the statute of

limitations with respect to any prosecution that is not time-barred on the date that this Agreement

is signed.

## GOVERNMENT'S AGREEMENT

3.     Subject to CDR's full compliance with the understandings specified in this

Agreement, and upon the Court's acceptance of the guilty pleas called for by this Plea

Agreement, the Antitrust Division agrees to move to dismiss Counts Three, Four, Five and Eight

of the Superseding Indictment upon imposition of sentence.  In addition, the Antitrust Division

will not bring further criminal charges against CDR with respect to any crime charged in the

Superseding Indictment.  This Agreement does not provide any protection against prosecution

for any crimes arising from the activity except as set forth above.  The non-prosecution terms of

this paragraph do not apply to civil or tax matters of any kind or crimes of violence.

2

4.      It is understood that this Agreement does not bind any other federal agency or local prosecuting authority or administrative agency other than the Antitrust Division.

## POSSIBLE MAXIMUM PENALTIES

5.      CDR understands that the statutory maximum penalty which may be imposed against it upon conviction for a violation of Title 15, United States Code, Section 1 as charged in Count One is: a fine in an amount equal to the greatest of:

(a)      $100,000,000;

(b)      twice the gross pecuniary gain to any person derived from the offense; or

(c)      twice the gross pecuniary loss caused to a person other than CDR from the offense. 15 U.S.C. § 1, 18 U.S.C. § 3571(c) and (d).

6.      In addition, CDR understands that:

(a)      the Court may impose a term of probation of at least one year, but not more than five years pursuant to 18 U.S.C. § 3561(c)(1);

(b)      the Court may order it to pay restitution to the victim(s) of the offense pursuant to United States Sentencing Guidelines ("U.S.S.G") § 8B1.1, and 18 U.S.C. § 3563(b)(2) or § 3663A; and

(c)      the Court is required to order CDR to pay a $400 special assessment upon conviction for the charged crime pursuant to 18 U.S.C. § 3013(a)(2)(B),

7.      CDR understands that the statutory maximum penalty which may be imposed against it upon conviction for a violation of Title 18, United States Code, Section 371 as charged in Count Two is a fine in an amount equal to the greatest of:

(a)      $500,000 (18 U.S.C. § 3571(c)(3)); or

(b)      twice the gross pecuniary gain to any person derived from the offense, or;

(c)     twice the gross pecuniary loss caused to a person other than CDR from the offense (18 U.S.C. § 3571(c) and (d)).

8.     In addition, CDR also understands that:

(a)     the Court may impose a term of probation of at least one year, but not more than five years pursuant to 18 U.S.C. § 3561(c)(1);

(b)     the Court shall order it to pay restitution to the victim(s) of the offense pursuant to U.S.S.G. § 8B1.1, 18 U.S.C. § 3563(b)(2) or § 3663A,; and

(c)     the Court is required to order CDR to pay a $400 special assessment upon conviction for the charged crime pursuant to 18 U.S.C. § 3013(a)(2)(B),.

9.     CDR understands that the statutory maximum penalty which may be imposed against it upon conviction for a violation of Title 18, United States Code, Sections 1343 and 1346 as charged in Count Six is a fine in an amount equal to the greatest of:

(a)     $500,000;

(b)     twice the gross pecuniary gain to any person derived from the offense, or;

(c)     twice the gross pecuniary loss caused to a person other than CDR from the offense (18 U.S.C. § 3571(c) and (d)).

10.     In addition, CDR understands that:

(a)     the Court may impose a term of probation of at least one year, but not more than five years pursuant to 18 U.S.C. § 3561(c)(1),;

(b)     the Court shall impose an order of restitution to the victim(s) of the offense pursuant to 18 U.S.C. §§ 3663, 3663A and 3664; and

(c)     the Court is required to order CDR to pay a $400 special assessment upon conviction for the charged crime pursuant to 18 U.S.C. § 3013(a)(2)(B).

4

## SENTENCING GUIDELINES

11.     CDR understands that the United States Sentencing Guidelines ("Sentencing Guidelines") are advisory, not mandatory, but that the Court must consider the Sentencing Guidelines in effect on the day of sentencing, along with the other factors set forth in 18 U.S.C. § 3553(a), in determining and imposing a sentence. CDR understands that determinations about a Sentencing Guidelines calculation will be made by the Court by a preponderance of the evidence standard. CDR understands that although the Court is not ultimately bound to impose a sentence within the applicable Sentencing Guidelines range, CDR's sentence must be reasonably based upon consideration of all relevant sentencing factors set forth in 18 U.S.C. § 3553(a).

## SENTENCING AGREEMENT

12.     CDR understands that the sentence to be imposed on it is within the sole discretion of the Sentencing Judge. It is understood that the Sentencing Guidelines are not binding on the Court. CDR acknowledges that its entry of guilty pleas to Counts One, Two and Six of the Superseding Indictment authorizes the Sentencing Court to impose any sentence, up to and including the statutory maximum sentence. The Antitrust Division cannot and does not make any promises or representations as to what sentence CDR will receive.

13.     The Antitrust Division reserves the right to make any statement to the Court or the Probation Office concerning the nature of the offenses charged in the attached Superseding Indictment, the participation of CDR therein, and any other facts or circumstances that it deems relevant. The Antitrust Division also reserves the right to comment on or to correct any representation made by or on behalf of CDR, and to supply any other information that the Court may require. In so doing, the Antitrust Division may use any information it deems relevant,

including information provided by CDR both prior and subsequent to the signing of this Agreement.

## REPRESENTATION BY COUNSEL

14.    CDR has reviewed all legal and factual aspects of this case with its attorney and is fully satisfied with its attorney's legal representation. CDR has thoroughly reviewed this Agreement with its attorney, and has received satisfactory explanations from its attorney concerning each paragraph of this Agreement and alternatives available to CDR other than entering into this Agreement. After conferring with its attorney and considering all available alternatives, CDR has made a knowing and voluntary decision to enter into this Agreement.

## VOLUNTARY PLEA

15.    CDR hereby acknowledges that it has accepted this Agreement and decided to plead guilty because it is in fact guilty. By entering these pleas of guilty, CDR waives any and all rights to withdraw its pleas or to attack its convictions, either on direct appeal or collaterally, on the ground that the Antitrust Division has failed to produce any discovery material, Jencks Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of CDR, and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that have not already been produced as of the date of the signing of this Agreement.

16.    CDR's decision to enter into this Agreement and to tender pleas of guilty is freely and voluntarily made and is not the result of force, threats, assurances, promises, or representations other than the representations contained in this Agreement.

6

## ENTIRETY OF AGREEMENT

17.     This Agreement constitutes the entire agreement between the Antitrust Division

and CDR concerning the disposition of the charges contained in the attached Superseding

Information.  The Antitrust Division has made no other promises to or agreements with CDR.

This Agreement cannot be modified except in writing, signed by the Antitrust Division and

CDR.

18.     The undersigned attorneys for the Antitrust Division have been authorized by the

Attorney General of the United States to enter this Agreement on behalf of the Antitrust

Division.

Dated: _12/30/11_

DAVID RUBIN
President, Chief Executive Officer,
RUBIN/CHAMBERS,
DUNHILL INSURANCE SERVICES,
INC. dba CHAMBERS, DUNHILL
RUBIN & CO. and CDR FINANCIAL
PRODUCTS, INC.

RICHARD BECKLER, ESQ.

Counsel for RUBIN/CHAMBERS,
DUNHILL INSURANCE SERVICES,
INC. dba CHAMBERS, DUNHILL
RUBIN & CO. and CDR FINANCIAL
PRODUCTS, INC.

REBECCA MEIKLEJOHN
STEVEN TUGANDER
KEVIN B. HART
MICHELLE O. RINDONE

Trial Attorneys, U.S. Department of Justice
Antitrust Division
26 Federal Plaza, Room 3630
New York, NY 10278
Phone: (212) 335-8000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                  :

UNITED STATES OF AMERICA            S1 09 Cr. 1058 (VM)
                  :

        v.                  Filed:
                  :      Violations:

RUBIN/CHAMBERS, DUNHILL INSURANCE        15 U.S.C. § 1
SERVICES, INC. dba CHAMBERS, DUNHILL,   :    18 U.S.C. § 371
RUBIN & CO. and CDR FINANCIAL           18 U.S.C. §§ 1343, 1346
PRODUCTS, INC.;               :     18 U.S.C. § 1001
DAVID RUBIN;                     18 U.S.C. § 1005
ZEVI WOLMARK, aka STEWART WOLMARK;   :    26 U.S.C. § 7212
and EVAN ANDREW ZAREFSKY,
                  :

                 Defendants.

-------------------------------------------------------------x

## INDICTMENT

The Grand Jury charges:

### COUNT ONE – CONSPIRACY TO RESTRAIN TRADE
(15 U.S.C. § 1)

1.     RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC.,

DAVID RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and EVAN

ANDREW ZAREFSKY are hereby indicted and made defendants on the charge stated

below.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: DEC 07 2010

# I. THE RELEVANT PARTIES AND ENTITIES

During the period covered by this Count:

2.    RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC. ("CDR") was a corporation existing under the laws of the State of California with its principal place of business in Beverly Hills, CA.  CDR was a wholly-owned subsidiary of CDR Holdings, Inc.  CDR did business as Chambers, Dunhill, & Rubin Co. and as CDR Financial Products, Inc.  CDR marketed financial products and services, including services as a broker or advisor to various municipalities throughout the United States.

3.    DAVID RUBIN, a resident of Los Angeles, CA, was the founder, president and chief executive officer of CDR and the sole owner of CDR Holdings, Inc.

4.    ZEVI WOLMARK, aka STEWART WOLMARK, a resident of Los Angeles, CA, was the chief financial officer and a managing director of CDR.

5.    EVAN ANDREW ZAREFSKY, a resident of Redondo Beach, CA, was a vice president of CDR.

6.    Whenever in this Count reference is made to any act, deed, or transaction of any corporation, such allegation shall be deemed to mean that the corporation engaged in such act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business affairs.

7.    Various other persons and entities, not made defendants herein, participated

2

as co-conspirators in the offense charged herein and performed acts and made statements
in furtherance thereof.

## II. BACKGROUND

8.      Municipal bonds are issued by government entities, such as states, counties,
and cities, or quasi-governmental entities, such as public authorities and school, utility or
water districts, to raise money for operating funds or for specific projects, such as the
construction of public facilities, and to refinance outstanding municipal debt. In some
instances, the entity issuing the bond turns the money over to a not-for-profit entity, such
as a school or hospital, or an entity that will spend the money for a specific public
purpose, such as the construction of low-cost housing or waste treatment facilities. Both
the entities that issue municipal bonds and the entities that receive and spend the money
are, unless otherwise stated, collectively referred to herein as "issuers," "municipal
issuers," or "municipalities." In 2007 and 2008, combined, approximately $800 billion in
municipal bonds were issued in the United States.

9.      The money an issuer raises from a municipal bond offering ("bond
proceeds") is typically spent over a period of time rather than immediately, in one lump
sum. The issuer frequently invests some or all of the bond proceeds in an investment
product (sometimes referred to as an "investment agreement") that is designed for its
specific needs. Investment agreements vary in size from a few hundred thousand dollars
to several hundred million dollars and in duration from as short as one month to as long

3

as thirty years.

10. Major financial institutions, including banks, investment banks, insurance companies, and financial services companies (collectively "providers") sell investment agreements through their employees or agents ("marketers").

11. Issuers usually select providers of investment agreements through bona fide competitive bidding procedures that are designed to comply with federal tax laws and United States Department of the Treasury regulations relating to the tax-exempt status of municipal bonds. Compliance with these regulations is monitored by the Internal Revenue Service ("IRS"), which is entitled to receive a portion of the earnings from a municipality's investment agreement under certain circumstances. Among other things, each provider submitting a bid typically certifies that specific Treasury regulations have been followed, including that the provider did not consult with any other potential provider about its bid and that all providers had an equal opportunity to bid, commonly referred to as the no "last looks" provision.

12. Issuers often hire third parties ("brokers") to act as their agents in conducting a bona fide competitive bidding process and complying with the relevant Treasury regulations. CDR was such a broker. Brokers owe a fiduciary duty to issuers that hire them and are required to act for the benefit of the issuer when conducting the competitive bidding process. The broker's fee for conducting a bona fide competitive bidding process is generally paid by the winning provider, which takes into account the

4

cost of the broker's fee when calculating its bid and discloses that fee to the issuer.

13.     Brokers offer a variety of services, including offering suggestions about the availability and suitability of investment products, drafting bid specifications, and identifying the most competitive, qualified providers to be solicited as bidders. In some cases, the broker decides which providers will be solicited to bid without consulting with the issuer or any of the other professional representatives advising the issuer.

14.     Brokers are usually responsible for distributing the bid packages (specifications and bid forms) to providers selected to receive them, usually via e-mail; keeping in touch with the potential bidders to answer questions about the bid specifications; conducting the bidding process, which typically involves receiving the providers' bids by telephone at a time identified in the bid specifications, followed by a confirming copy of the bid via facsimile. After reviewing the bids to ensure conformity with the specifications, brokers then inform the issuer of the outcome of the bid, including the identity of the winning, qualified bidder and, if appropriate, any conditions that deviate from the specifications. Brokers are often required by the issuer to provide written certification that the bidding procedures complied with the relevant Treasury regulations.

15.     Depending on the structure of the bid, providers may be asked to quote only the interest rate to be paid on funds on deposit for the duration of the agreement or they may be asked to submit a bid in the form of a dollar amount or date (sometimes referred to as the "price" or "price level" of a bid). In a typical investment agreement, providers are

5

asked to quote only an interest rate and, generally, the agreement is awarded to the provider quoting the highest rate.

16.     Many brokers that conduct bona fide competitive bidding for investment agreements subject to the Treasury regulations are also hired by municipalities and other quasi-governmental entities to conduct bona fide competitive bidding in connection with the award of other contracts involving public funds, even though those contracts are not subject to the Treasury regulations related to competitive bidding. These contracts (collectively, "other municipal finance contracts") include, but are not limited to, investment agreements for taxable municipal bonds; investment agreements for funds borrowed by entities in which the federal government or any municipal entity is a participant; and derivative contracts, which are contracts between a municipal issuer and a financial institution that are designed to manage or transfer some or all of the interest rate risk associated with a municipal bond issue. Other municipal contracts do not include underwriting contracts. CDR acted as a broker in the award of other municipal finance contracts.

## III. DESCRIPTION OF THE OFFENSE

17.     From at least as early as 1998 until at least November 2006, the exact dates being unknown to the Grand Jury, defendants CDR, RUBIN, WOLMARK and ZAREFSKY (collectively, the "CDR defendants") and co-conspirators engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

6

18. The aforesaid combination and conspiracy consisted of an agreement, understanding, and concert of action among the CDR defendants and co-conspirators, the substantial terms of which were to allocate and rig bids for investment agreements or other municipal finance contracts.

### IV. THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

19. For the purpose of forming and effectuating the aforesaid combination and conspiracy, the CDR defendants and co-conspirators did those things which they combined and conspired to do, including, among other things:

(a) designating in advance of the submission of bids to CDR which provider among the co-conspirator providers would be the winning bidder for certain investment agreements or other municipal finance contracts;

(b) discussing and agreeing on the prices or price levels co-conspirator providers would bid for certain investment agreements or other municipal finance contracts;

(c) submitting or causing to be submitted to CDR intentionally losing bids for certain investment agreements or other municipal finance contracts with the understanding that co-conspirator providers submitting the intentionally losing bids would be allocated other investment agreements or other municipal finance contracts. The intentionally losing bids made it appear both to the municipalities that had hired CDR as their broker and, where appropriate, to the IRS that the CDR defendants had solicited

7

potential providers that would and did compete for those agreements and contracts, when, in fact, they had not;

(d)     falsely certifying and forwarding false certifications that the bidding for certain investment agreements or other municipal finance contracts was in compliance with the relevant Treasury regulations or was otherwise competitive;

(e)     agreeing to pay and paying CDR kickbacks in the form of fees that were inflated, relative to the services performed, or unearned. These payments were in exchange for the CDR defendants' assistance in controlling the bidding process and for ensuring that certain co-conspirator providers won the bids they were allocated. Unlike the fees CDR was paid as a broker for conducting the bidding process, these fees were not disclosed to the municipalities that had hired CDR or to the IRS; and

(f)     paying municipalities or causing municipalities to be paid artificially determined or suppressed yields for the duration of certain investment agreements or other municipal finance contracts, thereby increasing the profitability of those agreements or contracts for the winning co-conspirator provider for their duration.

20.     For example, on numerous occasions, a co-conspirator provider recommended to a municipality that it hire CDR as broker, typically where the provider was the senior underwriter on an upcoming bond issue. In exchange, the CDR defendants attempted to ensure and did ensure that the same provider won one or more of the investment agreements associated with that same bond issue by recommending terms for

8

the investment agreement(s) that favored that provider, selecting other providers to bid that
would and did submit intentionally losing bids, and, after receiving information from the
intended winning provider regarding the price or price levels it intended to bid, telling the
other providers what prices or price levels to bid. As a result, the intended winning
provider increased its profits from the investment agreement(s) by paying interest to the
municipality for the duration of the investment agreement(s) at a rate that was artificially
low.

## V. INTERSTATE TRADE AND COMMERCE

21.     From at least as early as 1998 until at least November 2006, pursuant to the
investment agreements and other municipal finance contracts that are the subject of this
Count, the CDR defendants and co-conspirators caused substantial amounts of money to be
transferred between co-conspirator providers and municipal issuers and other government
or quasi-governmental entities throughout the United States.

22.     The activities of the CDR defendants and co-conspirators with respect to the
aforementioned investment agreements and other municipal finance contracts were within
the flow of, and substantially affected, interstate trade and commerce.

## VI. JURISDICTION AND VENUE

23.     The aforesaid combination and conspiracy was formed and carried out, in
part, within the Southern District of New York within the five years preceding the filing of
this Indictment.

9

IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1

## COUNT TWO – CONSPIRACY
### (18 U.S.C. § 371)

### VII. THE RELEVANT PARTIES AND ENTITIES

The Grand Jury further charges:

24.     RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC., DAVID RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and EVAN ANDREW ZAREFSKY are hereby indicted and made defendants on the charge stated below.

25.     Paragraphs 2 through 6 and 8 through 16 of Count One of this Indictment are repeated, realleged, and incorporated in Count Two as if fully set forth in this Count.

26.     Provider A was a group of related financial services companies located in Manhattan and owned or controlled by a company headquartered in Manhattan, and Marketer A, was a representative of Provider A.

27.     Financial Institution A was a financial institution that was a branch or agency of a foreign bank, within the meaning of Title 18, United States Code, Section 20.

28.     Financial Institution B was a financial institution that was a branch or agency of a foreign bank, within the meaning of Title 18, United States Code, Section 20.

### VIII. DESCRIPTION OF THE OFFENSE

29.     Various other persons and entities, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts in furtherance thereof. They included Provider A.

10

30.     From at least as early as August 2001 until at least November 2006, the exact
dates being unknown to the Grand Jury, in the Southern District of New York and
elsewhere, defendants CDR, RUBIN, WOLMARK and ZAREFSKY (collectively, the
"CDR defendants") and co-conspirators unlawfully, willfully, and knowingly did combine,
conspire, confederate, and agree together and with each other to commit offenses against
the United States, to wit, to violate Title 18, United States Code, Sections 1343, 1346 and
1005, and to defraud the United States and an agency thereof, to wit, the Internal Revenue
Service ("IRS") of the United States Department of the Treasury, all in violation of Title
18, United States Code, Section 371.

31.     It was a part and an object of the conspiracy that defendants CDR, RUBIN,
WOLMARK, and ZAREFSKY and co-conspirators, having devised and intending to
devise a scheme and artifice to defraud municipalities and to obtain money and property
from municipalities by means of false and fraudulent pretenses, representations, and
promises, namely, a scheme to deceive municipal issuers by manipulating the bidding
process for multiple investment agreements and other municipal contracts to favor Provider
A, and further to deprive municipal issuers of the intangible right to the honest and faithful
services of the CDR defendants and co-conspirators at CDR through kickbacks and the
concealment of material information, unlawfully, willfully, and knowingly, for the purpose
of executing such scheme and artifice, and attempting to do so, would and did transmit and
cause to be transmitted by means of wire, radio or television communication in interstate or

11

foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

32.     It was further a part and an object of the conspiracy that defendants CDR, RUBIN, WOLMARK and ZAREFSKY and co-conspirators would and did defraud the United States and the IRS by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue due and owing from municipal issuers and in exercising its responsibilities to monitor compliance with Treasury regulations related to tax-exempt municipal bonds, in violation of Title 18, United States Code, Section 371.

33.     It was further a part and an object of the conspiracy that defendants CDR, RUBIN, WOLMARK, and ZAREFSKY and co-conspirators, with intent to defraud the United States or any agency thereof, to wit, the United States Department of the Treasury and the IRS, pursuant to the scheme identified in this Count, participated, shared in and received (directly and indirectly) money, profit, property, and benefits, to wit, one or more kickbacks identified in this Count, through transactions, commissions, contracts and any other acts of a financial institution, to wit, Financial Institution A and B, in violation of Title 18, United States Code, Section 1005.

## IX. THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

12

34.    The CDR defendants and co-conspirators engaged in an ongoing scheme to defraud municipalities and the IRS by causing municipal issuers to enter into investment agreements and other municipal finance contracts with Provider A at artificially determined or suppressed price levels through the control and manipulation of the bidding for those agreements and contracts. In exchange, certain of the CDR defendants asked that Provider A pay kickbacks to CDR. Provider A agreed and arranged to pay kickbacks to CDR in the following manner: the kickbacks were disguised as fees ("hedge fees") that purported to compensate CDR for acting as a broker in arranging financial transactions known as swaps between Provider A and either Financial Institution A or B, but those fees were, in fact, unearned or inflated. The rates of Provider A's swaps with Financial Institutions A and B were adjusted to include the hedge fees Provider A wanted to pay CDR, and Financial Institutions A and B then paid the hedge fees to CDR. Neither CDR nor Provider A disclosed to issuers that Provider A had agreed to pay CDR hedge fees in connection with the award and execution of investment agreements or other municipal finance contracts. In some cases, these kickbacks reduced the amount of money the municipalities received and continue to receive pursuant to investment agreements or other municipal finance contracts awarded to Provider A.

35.    The CDR defendants attempted to increase the number and profitability of investment agreements and other municipal finance contracts awarded to Provider A by controlling which other providers were solicited for bids and securing the agreement of

13

other providers to submit intentionally losing bids, where possible, and by arranging for Marketer A to submit Provider A's bid last. Before Marketer A actually decided what price to bid, the CDR defendants and co-conspirators at CDR received and reviewed bids from other providers and gave Marketer A information about the prices, price levels or conditions of those bids, including, on occasion, the specific amounts other providers had bid. Marketer A then used that information to determine Provider A's bid. On some occasions, the CDR defendants told Marketer A that he could lower Provider A's bid and still win the contracts and, further, suggested the exact amount by or to which the bid could be reduced. Marketer A followed these suggestions. As a result of information the CDR defendants gave Marketer A about bids from other providers, Provider A was awarded and has performed and is scheduled to continue to perform investment agreements and other municipal finance contracts at artificially determined levels that deprived and will continue to deprive municipalities of money.

36. From time to time, certain of the CDR defendants asked Marketer A to submit intentionally losing bids for investment agreements or other municipal finance contracts, in order to create the appearance that Provider A was competing for agreements or contracts when, in fact, it was not.

37. The CDR defendants falsely certified or caused to be certified that the bidding process was bona fide and complied with relevant Treasury regulations or was otherwise competitive and received and forwarded bids and certifications from Marketer A or Provider

14

A and other co-conspirator providers containing corresponding false representations.

     38.    By secretly controlling and manipulating the bidding for investment agreements and other municipal finance contracts, the CDR defendants caused municipalities not to file required reports or to file inaccurate reports with the IRS, and to fail to give the IRS or the Treasury money to which it was entitled. This conduct jeopardized the tax-exempt status of the underlying bonds.

## X. OVERT ACTS

     39.    In furtherance of the conspiracy and to effect the illegal objects thereof, the CDR defendants and co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

     (a)    On numerous occasions, at or about the time the bid specifications stated that bids were due, the CDR defendants participated in interstate telephone calls between California and New York, New York during which they gave Marketer A information about the prices, price levels, or conditions of bids from other providers and Marketer A then used that information to determine Provider A's bid.

     (b)    On numerous occasions, at or about the time the bid specifications stated that bids were due, the CDR defendants participated in interstate telephone calls between California and New York, New York during which they asked Marketer A to submit intentionally losing bids for investment agreements and other municipal finance contracts and provided him with pricing information to assist him in doing so.

15

(c)     On numerous occasions, prior to taking bids for certain investment agreements or other municipal finance contracts, certain of the CDR defendants participated in interstate telephone calls between California and New York, New York with Marketer A and other co-conspirators during which they made or sought to make arrangements for CDR to receive kickbacks in the form of purported hedge fees that were not disclosed to the municipality. On at least ten occasions between approximately November 2001 and August 2005, CDR received kickbacks ranging in size from $4,500 to $475,000.

(d)     On numerous occasions, the CDR defendants falsely certified or caused to be certified that the bidding process complied with relevant Treasury regulations, or was otherwise competitive, and forwarded bids and certifications from Marketer A or Provider A and other co-conspirator providers containing corresponding false representations.

(e)     On numerous occasions, Provider A paid via wire transfer and is scheduled to continue to pay municipalities interest on money it received pursuant to investment agreements or other municipal finance contracts whose rates were artificially determined or suppressed.

(f)     With respect to the award and performance of three investment agreements for a state water development authority, the CDR defendants and co-conspirators committed the following overt acts, among others:

(i)     on or about October 23, 2003, during an interstate telephone conversation between California and New York, New York about 90 minutes before the

16

bids were due, defendant WOLMARK spoke to Marketer A about the arrangements for Provider A to pay CDR kickbacks in the form of hedge fees and to enter into one or more swaps with either Financial Institution A or B relating to the investment agreements for the state authority.

        (ii)    on or about October 23, 2003, during an interstate telephone conversation between California and New York, New York about 30 minutes after the bids were due, defendant ZAREFSKY gave Marketer A information about the bid prices submitted by other providers and suggested that Marketer A change the prices he was otherwise prepared to submit, including lowering the interest rate on one of the agreements to a specific number. Marketer A agreed to and did submit prices at the amounts or levels suggested by ZAREFSKY.

        (iii)    on or about October 23, 2003, after Provider A had been awarded the state authority's three investment agreements, Marketer A made arrangements to pay CDR a kickback in the form of a hedge fee in connection with a swap between Provider A and Financial Institution B relating to one of the investment agreements with the state authority.

        (iv)    on or about October 27, 2003, CDR sent an invoice to Financial Institution B for a $4,500 hedge fee in connection with the swap between Financial Institution B and Provider A relating to one of the investment agreements with the state authority.

17

(v) on or about October 31, 2003, CDR executed a broker's

certificate that, among other things, falsely stated: "All bidders had an equal opportunity to

bid. No 'last look' by any bidder was permitted."

(vi) on or about October 31, 2003, Provider A entered into three

investment agreements with the state authority, two at the rates determined through the

bidding conducted by CDR and the other adjusted to account for a change in the

specifications.

(vii) on or about November 3, 2003, CDR received via wire transfer a

kickback relating to one of the investment agreements with the state authority in the form of

a $4,500 hedge fee from Financial Institution B in connection with the swap between

Provider A and Financial Institution B.

(viii) on or about November 10, 2003, CDR sent an invoice to

Financial Institution B for a second $4,500 hedge fee in connection with the swap between

Financial Institution B and Provider A relating to one of the investment agreements with the

state authority.

(ix) beginning approximately in late November 2003 and continuing

until January 3, 2005, Provider A made monthly interest payments on one of the state

authority's funds at a rate that was artificially suppressed.

(x) on or about August 12, 2005, CDR received via wire transfer a

kickback relating to one of the investment agreements with the state authority in the form of

18

a $4,500 hedge fee in connection with the swap between Provider A and Financial
Institution B.

       (g)   With respect to the award and performance of an investment agreement
with a municipal port facility, the CDR defendants and co-conspirators committed the
following overt acts, among others:

       (i)   on or about September 26, 2002, during an interstate telephone
conversation between California and New York, New York about an hour before the bids
were due, defendant WOLMARK spoke to Marketer A about the arrangements for Provider
A to pay CDR kickbacks in the form of hedge fees and to enter into one or more swaps with
Financial Institution A.

       (ii)   on or about September 26, 2002, during an interstate telephone
conversation between California and New York, New York at about the time that bids were
due, defendant WOLMARK gave Marketer A information about the bids submitted by three
providers and they agreed on the rate Provider A would bid and the amount of the kickback
CDR would receive in the form of a hedge fee.

       (iii)   on or about September 26, 2002, after Provider A had been
awarded the municipal port facility's investment agreement, Marketer A made arrangements
to pay CDR a kickback in the form of a hedge fee in connection with a swap between
Provider A and Financial Institution A relating to that agreement.

       (iv)   on or about September 30, 2002, CDR received via wire transfer

19

a kickback in the form of a $25,000 hedge fee in connection with the swap between Provider A and Financial Institution A relating to the investment agreement with the municipal port facility.

(v) on or about October 15, 2002, CDR executed a broker's certificate that, among other things, falsely stated: "All providers were afforded an equal opportunity to bid (e.g., no provider was given a 'last look')."

(vi) on or about October 15, 2002, Provider A entered into an investment agreement with the municipal port facility at the rate determined through the bidding conducted by CDR.

(vii) beginning approximately in May 2003, Provider A made semi-annual interest payments to the municipal port facility at a rate that was artificially determined, which payments continued until at least October 2006.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371

## COUNT THREE – CONSPIRACY
### (18 U.S.C. § 371)

## XI. THE RELEVANT PARTIES AND ENTITIES

The Grand Jury further charges:

40.     RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC., DAVID RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and EVAN ANDREW ZAREFSKY are hereby indicted and made defendants on the charge stated below.

41.     Paragraphs 2 through 6 and 8 through 16 of Count One of this Indictment are repeated, realleged, and incorporated in Count Three as if fully set forth in this Count.

42.     Provider B was a group of separate financial services entities that were controlled by or were part of a company headquartered in Connecticut. Marketers B-1 and B-2 were representatives of Provider B from 1999 until 2001 and from 2000 until at least 2006, respectively. Both marketers worked at Provider B's offices in Manhattan.

43.     Various other persons and entities, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts in furtherance thereof. They included Provider B and Marketers B-1 and B-2.

## XII. DESCRIPTION OF THE OFFENSE

44.     From at least as early as August 1999 until at least November 2006, the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, defendants CDR, RUBIN, WOLMARK and ZAREFSKY (collectively, the "CDR defendants") and co-conspirators unlawfully, willfully, and knowingly did combine,

21

conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Title 18, United States Code, Sections 1343 and 1346, and to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of the Treasury, all in violation of Title 18, United States Code, Section 371.

45. It was a part and an object of the conspiracy that defendants CDR, RUBIN, WOLMARK, and ZAREFSKY and co-conspirators, having devised and intending to devise a scheme and artifice to defraud municipalities and to obtain money and property from municipalities by means of false and fraudulent pretenses, representations, and promises, namely, a scheme to deceive municipal issuers by manipulating the bidding process for multiple investment agreements and other municipal contracts to favor Provider B, and further to deprive municipal issuers of the intangible right to the honest and faithful services of the CDR defendants and co-conspirators at CDR through kickbacks and the concealment of material information, unlawfully, willfully, and knowingly, for the purpose of executing such scheme and artifice, and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

46. It was further a part and object of the conspiracy that defendants CDR, RUBIN, WOLMARK and ZAREFSKY and co-conspirators would and did defraud the

United States and the IRS by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue due and owing from municipal issuers and in exercising its responsibilities to monitor compliance with Treasury regulations related to tax-exempt municipal bonds, in violation of Title 18, United States Code, Section 371.

## XIII. THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

47. The CDR defendants and co-conspirators engaged in an ongoing scheme to defraud municipalities and the IRS by causing municipal issuers to enter into investment agreements and other municipal finance contracts with Provider B at artificially determined or suppressed price levels through the control and manipulation of the bidding for those agreements and contracts.

48. The CDR defendants attempted to increase the number and profitability of investment agreements and other municipal finance contracts awarded to Provider B by arranging for Marketer B-1 or B-2 to submit Provider B's bids last. Before Marketer B-1 or B-2 actually decided what prices to bid, the CDR defendants received and reviewed bids from other providers and gave Marketer B-1 or B-2 information about the prices, price levels or conditions of those bids, including, on occasion, the specific amounts other providers had bid. Marketer B-1 or B-2 then used that information to determine Provider

23

B's bids. On some·occasions, the CDR defendants told Marketer B-1 or B-2 that he could

lower Provider B's bid and still win the contract and, further, suggested the specific amount

by or to which the bid could be reduced. Marketers B-1 and B-2 followed these suggestions.

As a result of information the CDR defendants gave Marketers B-1 and B-2 about bids from

other providers, Provider B was awarded and has performed and is scheduled to continue to

perform investment agreements and other municipal finance contracts at artificially

determined levels that deprived and will continue to deprive municipalities of money.

49.     In exchange for controlling and manipulating the bidding for investment

agreements and other municipal finance contracts in order to increase the number and

profitability of the agreements and contracts Provider B won, certain of the CDR defendants

asked Marketer B-1 or B-2 to submit intentionally losing bids for investment agreements or

other municipal finance contracts, in order to create the appearance that Provider B was

competing for agreements or contracts when, in fact; it was not.

50.     The CDR defendants falsely certified or caused to be certified that the bidding

process complied with relevant Treasury regulations, or was otherwise competitive, and

forwarded bids and certifications from Marketer B-1 or B-2 or Provider B and other co-

conspirator providers containing corresponding false representations.

51.     By secretly manipulating and controlling the bidding for investment

agreements and other municipal finance contracts, the CDR defendants caused

municipalities not to file required reports with the IRS or to file inaccurate reports with the

24

IRS, and to fail to give the IRS or the Treasury money to which it was entitled. This

conduct jeopardized the tax-exempt status of the underlying bonds

52.　　In exchange for controlling and manipulating the bidding for investment

agreements and other municipal finance contracts in order to increase the number and

profitability of the agreements and contracts Provider B won, certain of the CDR defendants

also requested that Provider B pay kickbacks, and Provider B did in fact pay kickbacks, to

CDR. The kickbacks were to be disguised as fees ("hedge fees") that purported to

compensate CDR for acting as a broker in arranging financial transactions known as swaps

between Provider B and other financial institutions, but those fees were in fact unearned or

inflated.

## XIV.  OVERT ACTS

53.　　In furtherance of the conspiracy and to effect the illegal objects thereof, the

CDR defendants and co-conspirators committed the following overt acts, among others, in

the Southern District of New York and elsewhere:

　　　　(a)　　On numerous occasions, at or about the time the bid specifications

stated that bids were due, the CDR defendants participated in interstate telephone calls

between California and New York, New York during which they gave Marketer B-1 or B-2

information about the prices, price levels, or conditions of bids from other providers and

Marketer B-1 or B-2 used that information to determine Provider B's bids.

　　　　(b)　　On numerous occasions, at or about the time the bid specifications stated

25

that bids were due, the CDR defendants participated in interstate telephone calls or other wire transmissions between California and New York, New York during which they asked Marketer B-1 or B-2 to submit intentionally losing bids for investment agreements and other municipal finance contracts and provided them with pricing information to assist them in doing so.

(c)    On numerous occasions, prior to taking bids for certain investment agreements or other municipal finance contracts, certain of the CDR defendants participated in interstate telephone calls between California and New York, New York with Marketer B-1 or B-2 during which they made or sought to make arrangements for CDR to receive kickbacks in the form of purported hedge fees that were not disclosed to the municipality.

(d)    On numerous occasions, the CDR defendants falsely certified or caused to be certified that the bidding process complied with relevant Treasury regulations, or was otherwise competitive, and forwarded bids and certifications from Marketer B-1 or B-2 or Provider B containing corresponding false representations.

(e)    On numerous occasions, Provider B paid via wire transfer and is scheduled to continue to pay municipalities interest on money it received pursuant to investment agreements or other municipal finance contracts whose rates were artificially determined or suppressed.

(f)    With respect to the award and performance of an investment agreement for a state housing agency, certain of the CDR defendants and co-conspirators committed the

26

following overt acts, among others:

(i)     on or about May 19, 2004, during an interstate telephone call

between California and New York, New York, defendant RUBIN suggested to Marketer B-2

that he lower the rate he said he was preparing to quote because the issuer would have to give

any money it earned at the higher rate to the IRS.

(ii)     on or about May 20, 2004, the day of the bid, during an interstate

telephone call between New Mexico and New York, New York, Marketer B-2 checked with

a co-conspirator at CDR to make sure that a bid at the rate suggested by RUBIN would be a

winning bid and then submitted a bid in accordance with RUBIN's suggestion.

(iii)     beginning in approximately July 2004, Provider B made monthly

interest payments to the state housing agency at an artificially suppressed rate until

November 1, 2005.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371

27

## COUNTS FOUR THROUGH SIX – WIRE FRAUD
(18 U.S.C. § 1343, 1346)

The Grand Jury further charges:

54.    RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, INC. ("CDR"), DAVID RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and EVAN ANDREW ZAREFSKY are hereby indicted and made defendants on the charges stated below.

55.    Paragraphs 2 through 6 and 8 through 16 of Count One and Paragraphs 26, 27 and 29 of Count Two, and Paragraph 42 of Count Three of this Indictment, are repeated, realleged, and incorporated in Counts Four and Five, respectively, as if fully set forth in these Counts.

56.    Financial Institution C was registered with the Federal Reserve as a financial holding company headquartered in New York, New York and was a member of the Federal Reserve System within the meaning of Title 18, United States Code, Section 20.  Financial Institution C acted as a provider of investment agreements and other municipal finance contracts for issuers and participated in the competitive bidding process to provide those agreements and contracts.

57.    Financial Institution D was registered with the Federal Reserve as a financial holding company headquartered in Charlotte, North Carolina and was a member of the Federal Reserve System within the meaning of Title 18, United States Code, Section 20.  Financial Institution D acted as a provider of investment agreements and other municipal finance contracts for issuers and participated in the competitive bidding process to provide

28

those agreements and contracts.

## XV.  DESCRIPTION OF THE OFFENSE

58.     On or about the dates indicated below, in the Southern District of New York

and elsewhere, defendants CDR, RUBIN, WOLMARK and ZAREFSKY and other persons

known and unknown, unlawfully, willfully, and knowingly, having devised and intending to

devise a scheme and artifice to defraud municipal issuers and to obtain money and property

from municipal issuers by means of false and fraudulent pretenses, representations, and

promises, namely, a scheme to deceive municipal issuers by manipulating the bidding

process for multiple investment agreements and other municipal finance contracts to favor

certain providers, including Provider A, Provider B, Financial Institution A, Financial

Institution C and Financial Institution D, among others, and further to deprive municipal

issuers of the intangible right to the honest and faithful services of the CDR defendants and

co-conspirators at CDR through kickbacks and the concealment of material information, for

the purpose of executing such scheme and artifice, and attempting to do so, did transmit and

cause to be transmitted by means of wire, radio, or television communication in interstate

commerce, writings, signs, signals, pictures, or sounds the following:

COUNT FOUR: On or about August 12, 2005, via interstate wire transfer from New

York, New York to Beverly Hills, California, defendant CDR received a kickback in the

form of a $4,500 hedge fee in connection with one of three investment agreements that

defendants CDR, RUBIN, WOLMARK, and ZAREFSKY had caused a state water

development authority to award to Provider A at rates that had not been determined competitively.

COUNT FIVE: On or about June 30, 2005, via interstate wire transfer from New York, New York to Minneapolis, Minnesota, defendants CDR, RUBIN, WOLMARK and ZAREFSKY caused Provider B to make an interest payment of approximately $264,977.20 to a state housing corporation, which payment was artificially suppressed because, at the time of the bid, defendant ZAREFSKY gave Marketer B-2 information about bids from other providers on the basis of which Marketer B-2 lowered the rates he was otherwise prepared to submit.

COUNT SIX: On or about May 31, 2006, via interstate wire transfer from New York, New York to Kansas City, Missouri, defendants CDR, RUBIN, WOLMARK and ZAREFSKY caused Provider A to make an interest payment of approximately $442,341.39 to a state program, which interest payment was at an artificially determined rate because, at the time that Marketer A determined Provider A's bid, he was asked to pay and agreed to pay a kickback to CDR that amounted to $475,000.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTIONS 1343 AND 1346

30

## COUNT-SEVEN -- FALSE STATEMENTS BY ZAREFSKY
(18 U.S.C. § 1001)

The Grand Jury further charges:

59. EVAN ANDREW ZAREFSKY is hereby indicted and made a defendant on the charge stated below.

60. Paragraphs 5 and 8 through 16 of Count One of this Indictment are repeated, realleged and incorporated in Count Seven as if fully set forth in this Count.

61. On numerous occasions between 2000 and 2004, in connection with the bidding for investment agreements subject to the Treasury regulations, defendant ZAREFSKY gave information about the prices, price levels or conditions of other providers' bids to marketers for certain providers and those marketers used that information to determine what became the winning bid. During the same period, ZAREFSKY solicited intentionally losing bids from marketers at certain providers, including bids from marketers who told ZAREFSKY that the providers they represented were not able to enter into the investment agreements at issue. In addition, during the same period, ZAREFSKY saw and heard other CDR employees engaging in the same conduct.

62. On November 15, 2006, defendant ZAREFSKY unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device a material fact, and made materially false, fictitious, and fraudulent statements and representations, to wit, in connection with an investigation being conducted in the Southern

31

District of New York, ZAREFSKY was interviewed by agents of the Federal Bureau of

Investigation and the IRS during a search of the premises of CDR and falsely stated that the

deals he worked on were done within the regulations, that he did not give "last looks" in

connection with the bidding for investment agreements subject to the regulations, and that he

had no first-hand knowledge regarding "last looks" or "courtesy" bids.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1001(a)(1) and (2)

## COUNT EIGHT – INTERFERING WITH ADMINISTRATION
## OF INTERNAL REVENUE LAWS
### (26 U.S.C. § 7212(a))

The Grand Jury further charges:

63.    DAVID RUBIN, ZEVI WOLMARK, aka STEWART WOLMARK, and
EVAN ANDREW ZAREFSKY are hereby indicted and made defendants on the charges
stated below.

64.    Paragraphs 3 through 5 and 8 through 15 of Count One of this Indictment are
repeated, realleged, and incorporated in Count Eight as if fully set forth in this Count.

65.    From at least as early as February 1999, with respect to defendants RUBIN and
WOLMARK, and from at least as early as June 2000, with respect to defendant ZAREFSKY,
until at least November 2006, within the Southern District of New York and elsewhere,
defendants RUBIN, WOLMARK and ZAREFSKY, and other persons known and unknown,
did corruptly obstruct and impede, and endeavor to obstruct and impede, the due
administration of the Internal Revenue laws.

66.    Among the means and methods used by defendants RUBIN, WOLMARK and
ZAREFSKY to corruptly obstruct and impede and endeavor to obstruct and impede the due
administration of the Internal Revenue laws were the following:

(a)    On numerous occasions, RUBIN, WOLMARK and ZAREFSKY
conducted or authorized CDR employees to conduct bidding for investment agreements
subject to the Treasury regulations in a manner inconsistent those regulations by controlling

33

and manipulating the bidding so as to help particular providers win certain contracts, often at
increased profit levels. On some occasions, RUBIN, WOLMARK and ZAREFSKY selected
and solicited, or authorized or instructed other CDR employees to select and solicit, providers
to bid that would and did agree to submit intentionally losing bids. On other occasions,
RUBIN, WOLMARK and ZAREFKSKY gave or authorized or instructed CDR employees
to give the intended winning provider information about the prices, price levels or conditions
of bids from other providers, in some instances thereby causing the winning provider to
change its bid and increase its profits.

   (b)  RUBIN, WOLMARK and ZAREFKSY caused CDR to falsely certify
that the bidding process was <u>bona fide</u> and complied with relevant Treasury regulations and
caused CDR to receive and forward bids and certifications from providers containing
corresponding false certifications, thereby creating the appearance that there had been open
and honest competition for investment agreements, when, in fact, there had not.

   (c)  By secretly controlling and manipulating the bidding for investment
agreements subject to the Treasury regulations, RUBIN, WOLMARK and ZAREFSKY
caused municipalities not to file required reports or to file inaccurate reports with the IRS,
and to fail to give the IRS or the Treasury money to which it was entitled.

   (d)  With respect to an investment agreement for a state housing agency:

     (i)  on or about May 19, 2004, during an interstate telephone call
between California and New York, New York, RUBIN suggested to a provider's

34

representative that he lower the rate he said he was preparing to quote for an investment agreement because the issuer would have to give any money it earned at the higher rate to the IRS.

(ii)     on or about May 20, 2004, RUBIN caused CDR to receive a bid from the provider reflecting a rate in accordance with his suggestion and a certification that, among other things, falsely stated: "CDR Financial Products, Inc. has not provided us any information which induced us to bid a yield lower than the yield induced by the Request for Investment Agreement."

(iii)    on or about June 1, 2004, RUBIN caused CDR to execute and send to the issuer's counsel a broker's certificate that, among other things, falsely stated: "The winning bid was the highest yielding bona fide bid (determined net of any bidding agent's fees) which met the requirements of the bid solicitation[.]"

(e)     With respect to three investment agreements for a state water development authority:

(i)     on or about October 23, 2003, pursuant to standing instructions from RUBIN and WOLMARK, ZAREFSKY gave a provider's representative information about the bid prices submitted by other providers and suggested that the provider lower the interest rate on one of the agreements being bid to a specific number, which the provider did. On the same day, RUBIN, WOLMARK and ZAREFSKY thereby caused CDR to receive a bid at an artificially suppressed rate for that investment agreement and a certification that,

35

among other things, falsely stated: "CDR Financial Products, Inc. has not provided us any

information that induced us to bid a yield lower than the yield induced by the Request for

Investment Agreement."

(ii)     on or about October 31, 2003, RUBIN, WOLMARK and

ZAREFSKY caused CDR to execute a false broker's certificate relating to that same

investment agreement, as specified in Paragraph 39(f)(v) of Count Two of this Indictment.

IN VIOLATION OF TITLE 26, UNITED STATES CODE, SECTION 7212(a)

36

## COUNT NINE – FRAUDULENT BANK TRANSACTIONS
### (18 U.S.C. § 1005)

The Grand Jury further charges:

67.    DAVID RUBIN is hereby indicted and made a defendant on the charge stated below.

68.    Paragraphs 2 through 3 and 8 through 15 of Count One and Paragraphs 26 through 27, and 34 through 38, and 39(g) of Count Two of this Indictment are repeated, realleged, and incorporated in Count Nine as if fully set forth in this Count.

69.    On or about September 30, 2002, within the Southern District of New York and elsewhere, defendant RUBIN, with the intent to defraud the United States and the Department of the Treasury and the IRS of money and of true and accurate information regarding the bidding for an investment agreement with a municipal port facility, as more fully set forth above, participated, shared in, and received (directly and indirectly) money, profit, property, and benefits, through a transaction, commission, contract, and any other act of Financial Institution A, to wit, a $25,000 payment to RUBIN that was disguised as a hedge fee paid by Financial Institution A to RUBIN's company CDR, and was generated from a swap transaction between Financial Institution A and Provider A and

37

was related to the investment agreement that RUBIN caused the municipal port facility to

award to Provider A.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1005

Dated: 12/7/10                    A True Bill

_____

Foreperson


CHRISTINE A. VARNEY              RALPH T. GIORDANO
Assistant Attorney General       Chief, New York Office

SCOTT D. HAMMOND                 REBECCA MEIKLEJOHN
Deputy Assistant Attorney General  STEVEN TUGANDER
                                 KEVIN B. HART
                                 MICHELLE RINDONE
MARC SIEGEL
Director of Criminal Enforcement

Antitrust Division
U.S. Department of Justice

                                 Attorneys, Antitrust Division
                                 U.S. Department of Justice
PREET BHARARA
                                 26 Federal Plaza, Room 3630
United States Attorney           New York, New York 10278
Southern District of New York    (212) 264-0654


38

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

– v –

**RUBIN/CHAMBERS, DUNHILL INSURANCE
SERVICES INC. dba CHAMBERS, DUNHILL, RUBIN
& CO. and CDR FINANCIAL PRODUCTS, INC.;
DAVID RUBIN;
ZEVI WOLMARK, aka STEWART WOLMARK;
and EVAN ANDREW ZAREFSKY**

**Defendants.**

## INDICTMENT

09 Cr.

15 U.S.C. § 1
18 U.S.C. § 371
18 U.S.C. § 1343, 1346
18 U.S.C. § 1001
18 U.S.C. § 1005
26 U.S.C. § 7212

PREET BHARARA
United States Attorney.

**A TRUE BILL**

Foreperson.

12/7/10   Fld Supersdy Ind

May Judge Volge

## MINUTES OF A MEETING OF THE BOARD OF DIRECTORS

A meeting of the Directors of Rubin/Chambers, Dunhill Insurance Services, Inc. d/b/a

Chambers. Dunhill. Rubin & Co. and CDR Financial Products, Inc., a California

Corporation, was held at 9:00 a.m. on December, 29, 2011 at 100 South June Street, Los

Angeles, California.  The following persons constituting all board members were present:

David Rubin

David Rubin presided as Chairperson of the meeting and recorded the minutes of the
meeting.  The following resolution was unanimously adopted and recorded in the Minute
Books of said corporation in accordance with and pursuant to the Charter and By-Laws of
said corporation now in full force and effect, to wit:

RESOLVED

Rubin/Chambers, Dunhill Insurance Services, Inc. d/b/a Chambers. Dunhill. Rubin & Co.
and CDR Financial Products, Inc. will plead guilty to the following charges as currently
pending against it under indictment S1 09 Cr.  1058 (VM) in the Southern District of
New York on or about December 30, 2011: 15 U.S.C. § 1, 18 U.S.C. § 371, 18 U.S.C. §
1343 and 18 U.S.C. § 1346.


There being no further business presented, the meeting was duly adjourned.


Dated: December 30, 2011



David Rubin


Sworn to before me this the 30th of December, 2011.

Notary Public

Kenneth C. Murphy
Notary Public - State of New York
No. 02MU6241531
Qualified in Nassau County
My Commission Expires May 23, 2015