

**U.S. Department of Justice**

Antitrust Division

*New York Office*

| | |
|---|---|
| *26 Federal Plaza* | *212/335-8000* |
| Room 3630 | |
| *New York, New York 10278-0140* | *FAX 212/335-8023* |

January 27, 2014

BY HAND
The Honorable Kimba M. Wood
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Chambers/Dunhill Insur. Services, Inc. and David Rubin*
              S1 09 Cr. 1058

Dear Judge Wood:

      The Government respectfully submits this letter pursuant to § 5K1.1 of the United States Sentencing Guidelines (hereinafter "§ 5K1.1"), to provide the Court with the details surrounding the substantial assistance that Defendant David Rubin has provided to the Government in its investigation and prosecution of bid rigging and fraud in the municipal bonds industry. Because Defendant Rubin has substantially assisted the Government's investigation, the Government will request at the time of sentencing that the Court sentence Defendant in light of the factors set forth in § 5K1.1(a)(1)-(5) and thereby depart from the Guidelines. Defendant Rubin is scheduled to be sentenced on February 3, 2014.[1]

---

[1] The Government's 5K1.1 motion is predicated on the assumption that Defendant Rubin will continue to comply with the terms of his cooperation agreement and appear for his sentencing. The Government does not move for a downward departure from the applicable Sentencing Guidelines range at this time, but intends to make such a motion at sentencing, solely as a result of *United States v. Padilla*, 186 F.3d 136 (2d Cir. 1999), which precludes the Government, under the terms of a cooperation agreement, from withdrawing a § 5K1.1 motion once it has been filed.

I.  Background

The Superseding Indictment in this case was filed on December 7, 2010.[2] On December 30, 2011, less than one week before trial was scheduled to start (and after Judge Marrero rejected Defendant Rubin's request to delay the trial or sever his trial from the trial of his co-defendants), Defendant Rubin pleaded guilty to Counts One, Two and Six of the Superseding Indictment pursuant to a plea agreement filed the same day. Count One charged a violation of 15 U.S.C. § 1, Count Two charged a violation of 18 U.S.C. § 371 (with the objects of violating 18 U.S.C. §§ 1343, 1346 and to defraud the Internal Revenue Service), and Count Six charged violations of 18 U.S.C. §§ 1343 and 1346. In July 2012, the Government and Defendant Rubin entered into a superseding plea and cooperation agreement. As explained in more detail below, Defendant Rubin has cooperated and substantially assisted the Government's investigation since January 2012.

II.  Defendant Rubin's Conduct

CDR was one of the oldest and largest brokers of municipal investment agreements in the United States. Defendant Rubin was the company's founder, chief executive officer, managing director and sole owner. As sole owner, Rubin actively supervised CDR's business and received the vast majority of the firm's profits. Zevi ("Stewart") Wolmark was employed by CDR as its chief financial officer and managing director; he supervised the municipal side of CDR's business. Lower level employees including Dani Naeh (a marketer), Douglas Goldberg, Evan Zarefsky, Matthew Rothman and Mark Zaino (analysts), conducted bidding on behalf of CDR and reported to Rubin and Wolmark.

Count One charged Defendants Rubin and CDR with participating in a conspiracy to rig bids. Specifically, Rubin, CDR, CDR's co-conspirator employees and numerous co-conspirator providers entered into an agreement whereby the co-conspirators arranged which providers would win contracts in advance of the bidding. More specifically, Rubin and CDR often arranged for the co-conspirator provider that was serving as the underwriter on the underlying bond issue to be the winner.[3] As part of the agreement, the designated winning provider often provided a CDR employee with the bid rate at which it desired to win, and the CDR employee responsible for conducting the bid then divulged that rate to other co-conspirator providers, with the understanding that they would bid less competitively than the designated winning provider's desired rate. Accordingly, conspirator providers that were designated to lose particular contracts submitted intentionally non-competitive bids to CDR. Moreover, on many occasions, Rubin and CDR took steps to further reduce competition by limiting bid lists to conspiring providers. The conspiracy was designed to and did allow conspiring providers to win bids at artificially

---

[2] Rubin and his co-defendants, Chambers/Dunhill Insurance Services, Inc. ("CDR"), Zevi Wolmark and Evan Zarefsky, were first indicted on October 29, 2009. The indictment charged nine counts against these four defendants.

[3] The underwriter was often the financial institution that had recommended to the municipality that it hire CDR to act as broker.

2

increased profit levels. In exchange for CDR's manipulating the bidding process to favor particular conspirator providers, Rubin arranged for CDR to be paid kickbacks that were sometimes disguised as legitimate broker fees on other, seemingly unrelated transactions. Following the award of bids, CDR and various co-conspirator providers submitted numerous written misrepresentations, falsely certifying that the bidding had been conducted in a *bona fide* manner, and in accordance with procedures outlined by the United States Treasury regulations. The Government alleged that during the time period that Rubin and CDR participated in the conspiracy charged in Count One, 113 separate transactions were subject to the bid rigging conduct.

      Count Two charged Defendants Rubin and CDR with conduct that they engaged in primarily with employees of FSA, a provider of investment agreements. Specifically, Rubin permitted CDR employees, particularly Wolmark and others acting at Wolmark's direction, to improperly disclose information about other bidders and their bid prices that allowed FSA to win bids for investment agreements at artificially determined and suppressed interest rates. In addition, Rubin knew that CDR employees frequently requested and received intentionally losing "courtesy" bids from FSA. These intentionally losing bids made it appear to municipalities and the IRS that FSA had competed for particular investment contracts, when in fact it had not. In exchange for CDR's manipulating the bidding process to favor FSA, Rubin arranged and allowed other CDR employees to arrange for CDR to be paid kickbacks that were disguised as legitimate "hedging" fees.[4] Following the award of bids, CDR and FSA submitted numerous written misrepresentations, falsely certifying that the bidding had been conducted in a *bona fide* manner, and in accordance with procedures outlined by the United States Treasury regulations. The Government alleged that during the time period that Rubin and CDR participated in the conspiracy charged in Count Two, 62 separate transactions were subject to the charged conduct.

      Count Six charged Defendants Rubin and CDR with a substantive wire fraud charge that encompasses the same conduct charged in Counts One and Two, as well as additional conduct involving additional providers such as GE. Count Six alleges that as part of the scheme, co-schemer FSA wired an interest payment to one of the numerous municipalities that was victimized by the scheme. The Government alleged that during the time period that Rubin and CDR participated in the scheme charged in Count Six, 58 transactions in addition to those included in Counts One and Two were subject to the fraudulent conduct.

      The municipal issuers that entered into investment agreements brokered by Defendants Rubin and CDR were harmed in several ways. First, because the competitive bidding process

---

[4] In conjunction with winning investment agreements, FSA routinely entered into hedging transactions with third party financial institutions in order to minimize its interest rate risk. On a number of fraudulent transactions, FSA paid kickbacks to CDR that were disguised as fees paid for brokering these secondary hedging transactions, when in fact the payments were made in exchange for CDR's assistance in manipulating the underlying bidding process. The conspirators took steps to further conceal these payments from detection by arranging for third parties, rather than FSA, to make the "brokerage" payments directly to CDR. FSA would, in turn, reimburse these third parties for the full amount of the kickbacks.

was corrupted, issuers received lower interest rates and, thus, less money than they would have received in a truly competitive environment. In addition, because the bidding process was corrupted, Rubin and CDR and their conspirator providers placed issuers at risk that the IRS would declare their bonds taxable, which could have resulted in devastating reputational and monetary consequences. Furthermore, municipalities were denied the right to control their money and property because the false certifications that CDR and the providers submitted to them affected their ability to make discretionary economic decisions about what to do with their money and property.

The conduct of Defendants Rubin and CDR and their co-conspirator providers also defrauded the United States Treasury and the IRS in two ways. First, because the IRS relied on the accuracy of the bidding certifications provided by brokers and providers, its ability to accurately determine and collect revenue for the United States Treasury was impeded and obstructed. Second, because the corrupted bidding process had the effect of reducing interest rates paid by providers, the United States Treasury received less money on some transactions than it was entitled to receive.

III.   The Government's Investigation and Prosecutions of the Municipal Bonds Industry

This case resulted from a wide-ranging investigation of bid rigging and fraud related to the municipal bonds industry that began in late 2004. The investigation uncovered fraudulent, anti-competitive behavior by numerous individuals who were employed by brokers and providers, primarily major financial institutions. These collusive and fraudulent practices, involving complex financial instruments, affected the bidding for contracts for the investment of billions of dollars of public funds and consequently victimized the United States Treasury as well as countless municipalities located throughout the United States.

To date, thirteen individuals and one corporation have pleaded guilty to antitrust, fraud, and other charges. In addition, five large financial institutions have entered into settlement agreements requiring them to pay approximately $743 million in restitution, disgorgement and penalties. Moreover, six former employees of financial companies were charged and convicted after trial of multiple counts in the Southern District of New York before Your Honor and Judge Baer. *See United States v. Carollo, et al.*,[5] 10 Cr. 654 (S.D.N.Y.) (Baer, J.); *United States v. Ghavami, et al.*, 10 Cr. 1217 (Wood, J.). Another individual, a former Bank of America executive, was indicted in the Western District of North Carolina in July 2012 and is scheduled to be tried in February 2014. *See United States v. Murphy*, 12 Cr. 235 (MOC). Eleven defendants have been sentenced to date.

---

[5]   The *Carollo* defendants' convictions were reversed by the Second Circuit in November 2013, where the majority of the panel found the prosecution untimely. On January 22, 2014, the Government filed a petition seeking a rehearing *en banc*.

IV.   Defendant Rubin's Cooperation

A. Background

As noted above, Defendant Rubin began cooperating with the Government's investigation in January 2012, shortly after his trial was scheduled to start. Approximately two weeks after Rubin entered his plea and a plea on behalf of CDR, his co-defendants, Stewart Wolmark and Evan Zarefsky, also pleaded guilty and indicated their interest in cooperating with the Government's investigation. The Government had no intention of calling Rubin as a witness at the trial of his co-defendants and Rubin's cooperation did not focus in any way on their conduct in the charged crimes. Nevertheless, the Government acknowledges that Rubin's decision to plead guilty likely had some effect on the decision of his co-defendants to plead guilty.

Defendant Rubin's agreement to cooperate included: meeting with the Government whenever it requested; providing, reviewing and analyzing documents; and testifying if necessary. From the Government's perspective, there is no question that Rubin has fulfilled the terms of his cooperation agreement in all respects. At the time Rubin began to cooperate, the Government was already preparing for the upcoming *Carollo* and *Ghavami* trials, which occurred in April 2012 and July 2012, respectively. Rubin proffered significant information relating to his own interactions with Peter Ghavami, the co-head of the relevant UBS municipal derivatives desk, and, to a limited extent, with Gary Heinz, who also worked on that desk and, as Your Honor is aware, ultimately testified during the Government's case-in-chief in the *Ghavami* trial. As detailed below, Rubin also proffered information relating to other actual or potential defendants, but the Government determined that it would not call Rubin as a witness at any other pending or contemplated trials and that it would not prosecute any additional individuals or companies based on Rubin's information. In addition, Rubin recently demonstrated his willingness to continue to help the Government, even after it became clear that he would not testify at any other trials, by agreeing to pay for the processing of archived emails seized during the search of CDR's premises.

B. 5K1.1 Factors

Section 5K1.1 sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has provided substantial assistance. The application of each of those factors to Rubin's cooperation is set forth below.

1. The Significance and Usefulness of Defendant's Cooperation

At the time Defendant Rubin began cooperating, three individuals associated with UBS, Peter Ghavami, Gary Heinz, and Michael Welty, were already indicted. As Your Honor is aware, these three defendants worked on UBS's Municipal Reinvestment and Derivatives ("MRED") desk, within UBS's municipal securities group. Ghavami was the co-head of the group and had supervisory authority over the MRED desk. Heinz was the manager of the MRED desk. The MRED desk both brokered municipal investment agreements (for bond issues

5

underwritten by UBS) and bid on those agreements. The three defendants were first indicted in December 2010 and, among other things, charged with engaging in a conspiracy to defraud with CDR.

By December 2010, when Defendant Rubin offered to cooperate, the Government already had substantial evidence incriminating each of the UBS defendants in the charged conspiracy with CDR from three former CDR employees - Mark Zaino, who left CDR in March 2001 to work on the MRED desk, Douglas Goldberg, and Matthew Rothman. Zaino, especially, provided particularly strong evidence regarding the manipulation of bids when UBS was bidding on transactions brokered by CDR. Nevertheless, Rubin, who was Ghavami's primary point of contact at CDR, was able to provide unique and strong direct evidence relating to decisions and strategies he and Ghavami discussed and agreed to, as the heads of their respective organizations, both when Ghavami first became the supervisor of the combined UBS municipal securities group and MRED and later. Also, Rubin was able to provide background evidence relating to Ghavami's familiarity during the period when Ghavami worked at JPMorgan with the kinds of bid manipulation that Ghavami and CDR ultimately engaged in during the charged conspiracy.

In the Government's view, Defendant Rubin was a valuable and effective trial witness. He substantially assisted the Government's ability to present incriminating evidence to the jury relating primarily to Ghavami, the defendant against whom the Government previously had the least evidence regarding the conspiracy between CDR and the three charged *Ghavami* defendants. Rubin's testimony was especially valuable because it helped to refute the *Ghavami* defendants' claim that the corrupt relationship between CDR and UBS was the result of Mark Zaino's relationship with his former employer, CDR, and that Zaino hid his illegal conduct from his UBS co-workers and supervisors, including Ghavami, Heinz and Welty. Rubin provided persuasive evidence that placed the foundation of the corrupt relationship in context – it was the outgrowth of his prior relationship with Ghavami and Heinz while they worked at JPMorgan. He also provided a firm foundation that allowed the government to prove that the ultimate responsibility for the illegal relationship between the *Ghavami* defendants and CDR began and remained with Ghavami, regardless of the fact that Heinz and Welty communicated with CDR more frequently.

Specifically, regarding the background of Ghavami's relationship with CDR, Defendant Rubin provided evidence that he and other CDR employees had ensured that JPMorgan won approximately 10 transactions during the period that Ghavami (who was not a supervisor at the time) and Heinz worked at JPMorgan, that Ghavami and Heinz knew of and participated in that conduct, and that he and Ghavami had had a series of conversations relating to the pricing and profitability (for JPMorgan) of a number of specific transactions before the bids. Although Douglas Goldberg had already provided similar evidence, Rubin's evidence was highly probative because of his own relationship with Ghavami.

With regard to Ghavami's conduct while employed at UBS, Defendant Rubin provided specific testimony regarding an initial conversation with Ghavami following UBS's acquisition of Paine Webber in late 1999 in which they discussed what they anticipated to be UBS's range of capabilities in the municipal market. Rubin testified that, during that conversation, Ghavami said that he wanted UBS to have a relationship with CDR that replicated the one CDR had with

6

JPMorgan. At the time of this discussion, Rubin and Ghavami hoped that UBS would eventually be able to be a full-service provider in the municipal market, meaning that it would be able to offer the full range of investment agreements, enter into swaps directly with municipalities, and enter into risk-sharing (otherwise known as back-to-back transactions) with other providers. As UBS and Paine Webber merged their operations, Rubin and Ghavami spoke regularly and Ghavami updated Rubin on UBS's plans and capabilities. By early 2001, Rubin and Ghavami reached an understanding that, on bond issues where UBS was the underwriter, UBS would try to ensure that CDR was selected as the broker and, in exchange, CDR would attempt to ensure that UBS won any associated investment agreements it was capable of providing, specifically, escrows. According to Rubin, as part of their mutual agreement, Ghavami also agreed that UBS could be depended on to provide CDR with losing bids, on request. The MRED desk's willingness to submit intentionally losing bids extended even to bids for investment products that UBS was not qualified to provide, particularly after it became clear that UBS management was not going to allow the MRED desk to provide a full range of municipal investment products and that, as a result, the desk would be limited to providing securities for escrows. Shortly thereafter, when it also became clear that UBS management would not permit the MRED desk to engage in the type of risk-sharing or back-to-back transactions with another provider of municipal investment agreements, comparable to transactions that CDR had been setting up with JPMorgan while Ghavami and Heinz worked there, Rubin and Ghavami discussed and agreed that UBS could, at least, act as a swap counterparty to providers that CDR steered to UBS for generic swaps.

     On the subject of CDR's promoting UBS as a swap counterparty to other financial institutions, Defendant Rubin testified that he and Ghavami agreed that UBS would provide swaps to FSA that were designed to hedge risk from investment agreements that CDR had steered to FSA. They further discussed and agreed that UBS would adjust its leg of the swap so as to capture excess profits that CDR had arranged for FSA to receive on the underlying investment agreements and then return those profits to CDR as a kickback in the form of a swap fee. Rubin estimated that UBS passed approximately $1 million in kickbacks on behalf of FSA to CDR in this manner. Rubin specifically testified that Ghavami expressed his goal of making sure that the MRED desk, rather than the UBS swap marketing desk that would normally service FSA in such swaps, would get the marketing credit for any swaps directed to UBS by CDR and his expectation that UBS's margin on such swaps would be wider, *i.e.*, more profitable, than the margins would be if the swaps were placed with UBS through the normal swap marketing desk.

     On the subject of UBS as a swap counterparty to municipalities, Defendant Rubin testified that in approximately 2002, Ghavami asked Rubin to refrain from having CDR become a swap advisor, which involved opining on the fairness of proposed swaps between municipalities and financial institutions such as UBS, or risk losing UBS's referral of CDR as a broker for investment agreements. Because of his relationship with UBS and the other financial institutions that provided swaps to municipalities, Rubin, in fact, decided to delay CDR's entry into this business for approximately 18 months.

     Finally, Defendant Rubin testified about a conversation in the fall of 2001 with Ghavami in which he expressed his displeasure in receiving UBS's contribution to a conference that CDR and UBS were sponsoring in the form of a swap fee on a transaction that CDR had no actual

7

connection with (the mechanism sometimes used to pay CDR kickbacks), rather than as a payment by UBS to the conference organizer. Rubin also related that he had a similar conversation with Heinz.

Defendant Rubin met with the government on approximately six occasions to provide information about Ghavami and to prepare for his testimony at the *Ghavami* trial. Rubin's testimony at the *Ghavami* trial lasted a total of approximately one day.

In addition, although Rubin will not be called as a trial witness in the upcoming *Murphy* trial, he met with the Government on two occasions in 2013 in connection with Government's preparation for this trial.

Moreover, during the course of his approximately fifteen months of cooperation, Defendant Rubin spent substantial time providing incriminating information against additional, uncharged industry participants including several individuals and financial companies. In particular, Rubin provided extensive evidence and analysis regarding a series of transactions involving the proceeds of bonds issued to support the purchase of homes by low-income individuals. These bonds were known as the "lease-to-own" ("LTO") bonds and, with one exception, all of the bond proceeds were invested with █████████████████. Rubin was personally involved in the negotiations with the two individuals working at the relevant ███ desk and arranged to receive a secret share of ████'s profits, in the form of an advisory fee, in addition to CDR's normal brokerage fee. These secret fees totaled over $5 million. ████████████████████████████████████████████████████████████████████████████████████████████████████ Nonetheless, Defendant Rubin spent time discussing the conduct of these uncharged subjects, and stood willing to testify at trial if needed.

2. The Defendant's Truthfulness, Completeness and Reliability

In the Government's view, since he began cooperating with the Government in January 2012, Defendant Rubin has been truthful, complete and reliable. Rubin has strived to be as helpful and cooperative as possible and has, at his own initiative, as well as when requested by the Government, undertaken to review CDR documents in order to discover or develop information. Despite his own obvious culpability, Rubin did not attempt to minimize his role in the conduct he was discussing, nor did he appear to withhold information, or protect particular individuals or corporations. Moreover, Rubin attempted to make himself available to the Government whenever he was needed, despite his wife's continuing health issues.

3. The Nature and Extent of the Defendant's Assistance

As noted above, Defendant Rubin has been cooperating with the Government's investigation since January 2012. In addition to the approximately seven days he spent preparing to testify and testifying during the *Ghavami* trial, he met with the Government on approximately eleven other occasions. Also, at the Government's request, Rubin recently arranged for the electronic conversion of approximately 400,000 emails that were electronically archived by CDR

and seized during a search warrant so that they could be loaded into the Government's data base and searched. This cost CDR approximately $60,000.

4. The Timeliness of the Defendant's Assistance

As noted above, Defendant Rubin began to cooperate in January 2012, shortly after his trial was scheduled to start. By the time Defendant Rubin began cooperating, the Government's investigation was at an advanced stage, and already included the cooperation of four CDR witnesses, and numerous others. Nonetheless, Defendant Rubin's cooperation was timely enough to allow him to prepare for and testify effectively in the *Ghavami* trial.

5. Risk of Injury

The Government has no reason to believe that Defendant Rubin was ever in physical danger as a result of his cooperation.

V.   Conclusion

Because Defendant Rubin has cooperated in the Government's investigation and prosecutions for approximately 18 months, the Government respectfully submits that he has provided "substantial assistance" as that term is defined by the Sentencing Guidelines. Therefore, assuming that Defendant Rubin continues to comply with the terms of his plea and cooperation agreement, the Government will request on February 3, 2014 that the Court impose a sentence on Defendant Rubin that departs from the Guidelines, pursuant to § 5K1.1.

Respectfully submitted,

REBECCA MEIKLEJOHN
Trial Attorney
Antitrust Division

cc:   Bradley Simon (by email)
      Richard Beckler (by email)